Complaint

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
Athens Division

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. CLETUS WILLIAM COLE, and the STATE OF GEORGIA, ex rel. CLETUS WILLIAM COLE, | |
| *Plaintiffs and Relator/Plaintiff* | Civil Action File No.: _____ |
| v. | |
| HOMESTEAD HOSPICE MANAGEMENT, LLC; HOMESTEAD PALLIATIVE CARE, INC.; CREATIVE HOSPICE CARE, INC.; CREATIVE HOSPICE HOLDING LLC; HOMESTEAD HOPE FOUNDATION, INC.; HOMESTEAD HOSPICE OF CAHABA LLC; HOMESTEAD HOSPICE OF SOUTHERN ALABAMA LLC; HOMESTEAD HOSPICE OF SOUTHWEST ALABAMA, LLC; CREATIVE HOSPICE & PALLIATIVE CARE OF ARIZONA, INC.; HOMESTEAD HOSPICE OF PHOENIX LLC; HOMESTEAD HOSPICE OF BLAIRSVILLE, LLC; HOMESTEAD HOSPICE OF CARTERSVILLE, LLC; HOMESTEAD HOSPICE OF CENTRAL GEORGIA LLC; HOMESTEAD HOSPICE OF NORTHWEST GEORGIA LLC; HOMESTEAD HOSPICE OF CHARLESTON LLC; HOMESTEAD HOSPICE OF COLUMBIA LLC; HOMESTEAD HOSPICE OF FLORENCE, INC.; HOMESTEAD HOSPICE OF GREENVILLE LLC; HOMESTEAD HOSPICE OF SPARTANBURG, INC.; MAHLEGA ABDSHARAFAT, A/K/A MALLIE SHARAFAT; ABDSHARAFAT TRUST; and ESHAG LLC, | JURY TRIAL DEMANDED<br><br>**FILED UNDER SEAL** |
| *Defendants.* | |

## COMPLAINT

1

Complaint

1.

On behalf of the United States, Relator Cletus William Cole has filed this qui tam action against Defendants for their knowing acts and omissions in violation of the False Claims Act, 31 U.S.C. §3729 *et seq.*  Additionally, this qui tam action is brought by Relator on behalf of the State of Georgia for treble damages and penalties under the Georgia Medicaid False Claims Act, O.C.G.A. § 49-4-168, *et seq.*  Relator Cole alleges that the Defendants defrauded Medicare, Medicaid and other government-funded healthcare programs by unnecessarily billing for expensive hospice care called "continuous care," by violating the Anti-Kickback Statute, and by billing for patients who were ineligible for hospice care.

## **OVERVIEW**

2.

Homestead Hospice treats patients who are dying and need hospice care — and it wants more of them.  Homestead has three schemes to gouge more payments out of government-funded healthcare programs.

3.

First, Homestead pledges to give between 8 and 24 hours of free, one-on-one, care to every patient who is discharged from the hospital.  Homestead agrees to provide this "transitional care" to any patient who leaves the hospital for any reason, regardless of whether the patient needs it.

4.

While the "transitional care" program is free to hospitals, senior living facilities and patients, it is not free to Medicare.  When Homestead provides "transitional care" to a patient, it bills Medicare for "continuous care," an ostensibly rare form of one-on-one hospice care that costs Medicare more than five times what regular hospice care does.  Homestead liberally offers "continuous care" to patients who do not need it, including patients who are receiving free "transitional care" because they are leaving the hospital.

5.

Second, Homestead uses a variety of kickbacks to garner healthcare business funded by the federal and state governments.

6.

"Transitional care" is, in fact, a centerpiece of the kickback scheme.  To get business from hospitals, Homestead dispatches its sales representatives armed with an article and information about how Medicare penalizes hospitals that have too many readmissions.  "Transitional care," the representatives say, can keep patients at home and prevent readmissions that will damage the hospital's bottom line.  When sales reps meet with senior living facilities, they are trained to explain that "transitional care" will take the burden off the facility's staff.  When sales reps

make their pitches to potential patients, they focus on the fact that Homestead is offering the patient at least 8 hours of free, one-on-one, health care.

7.

Hedging its bets, Homestead also offers a cluster of other kickbacks designed to tantalize referral sources. Homestead offers free certified nursing assistants to care for all the patients at senior living facilities, regardless of whether the patients are patients of Homestead's or are even on hospice. To help the facilities entertain their residents, Homestead has set up a Nurturing Arts program staffed by a permanent director who hires a troupe of professional actors and artists. The program offers shows ranging from plays to belly dancing to a murder mystery theater event at facilities that may refer business. Homestead also hosts events, such as Casino Nights, Italian food and wine tasting, and fall festivals with petting zoos. It gives prizes and gifts to attendees at many of these events. Homestead stocks its sales representatives with freebies like bed pads, diapers, wipes, and pull ups – even cookies -- to hand out, for free, to Homestead patients. Homestead also "takes care of" the staff and physicians at the various facilities that could or did refer business, offering perks like catered lunches from Longhorn or Chick-Fil-A for the entire staff.

Complaint

8.

Wielding this powerful array of kickbacks, Homestead has turned itself into a competition-crushing juggernaut.

9.

Third, Homestead provides hospice services to people who are not within six months of death and therefore are not eligible for hospice care.

## JURISDICTION AND VENUE

10.

This is an action by the United States of America and the State of Georgia, ex rel. Clete Cole, against Defendants to recover damages and civil penalties on behalf of the United States of America and the State of Georgia arising from false and/or fraudulent statements, records, and claims made and caused to be made by the defendants and/or their agents and employees in violation of the Federal False Claims Act, 31 U.S.C. § 3729, *et seq.*, the Anti-Kickback statute, and the Georgia False Medicaid Claims Act, O.C.G.A. § 49-4-168, *et seq.*

11.

The United States of America and the State of Georgia are the real parties in interest to the claims in this action.

Complaint

12.

Pursuant to 28 U.S.C. § 1331, the Defendants are subject to federal question jurisdiction in this Court because this action arises under laws of the United States, including 31 U.S.C. §§ 3729 and 3730, and other relevant federal statutes. Supplemental jurisdiction for counts related to the Georgia False Medicaid Claims Act arises under 28 U.S.C. § 1367, since these claims are so related to the federal claims that they form part of the same case or controversy under Article III of the U.S. Constitution.

13.

Additionally, Defendants are subject to jurisdiction and venue in this Court where "one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred." 31 U.S.C.A. § 3732(a). Accordingly, jurisdiction and venue are appropriate in Georgia because, among other reasons, some of the Defendants can be found, maintain offices, transact business and reside in Georgia and in the Middle District of Georgia. In addition, acts proscribed by § 3729 occurred here in the Middle District of Georgia. Venue furthermore is proper in this District under 28 U.S.C. § 1391.

14.

There has been no public disclosure of substantially the same allegations or transactions as alleged in this Complaint (i) in a Federal criminal, civil, or

administrative hearing in which the Government or its agent is a party; (ii) in a

Congressional, Government Accountability Office, or other Federal report,

hearing, audit, or investigation; or (iii) from the news media.

15.

This action is not based primarily on disclosures of specific information

(other than information provided by the Relator) related to allegations or

transactions in a criminal, civil, or administrative hearing, in a congressional,

administrative or Government [General] Accounting Office report, hearing, audit,

or investigation, or from the news media.

16.

The facts and circumstances alleged in this complaint have not been publicly

disclosed in a State of Georgia criminal, civil or administrative hearing in which

the State of Georgia or a local government or its agent was a party, nor in any state

or local government legislative or other state or local government report, hearing,

audit, or investigation that is made on the public record or disseminated broadly to

the general public, or from the news media.

17.

This action is not based primarily on disclosures of specific information

(other than information provided by the Relators) related to allegations or

transactions in a criminal, civil, or administrative hearing, in a legislative,

administrative or Attorney General hearing, audit, or investigation, or from the news media.

18.

Relator is an "original source" of the information upon which this complaint is based, as that term is used in the False Claims Act and the Georgia Medicaid False Claims Act.

19.

Relator has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided disclosure of the allegations of this complaint to the United States and the State of Georgia prior to filing, as required by the relevant statutes.

## I.    THE PARTIES, JURISDICTION AND VENUE.

20.

The Relator, Clete Cole, is a former employee of Defendant Homestead Hospice.  The Defendant operates its hospice business under many different corporate names.

A.     **Relator Clete Cole.**

21.

Mr. Cole worked for Homestead Hospice from May 1, 2013 to July 2014 as one of five "community liaisons" (Homestead's term for "sales representatives") in the Cartersville, Georgia, office.   Mr. Cole's job was to get nursing home, hospitals, and other medical providers to refer business to Homestead Hospice.

22.

In 2014, Homestead fired Mr. Cole, saying his "numbers weren't there," meaning that he had not brought in a sufficient number of dying people.

23.

Compassus sent Mr. Cole to two weeks of training in Nashville.  Though he had been in the hospice industry, Mr. Cole had never before had training on what was legal or ethical.  Mr. Cole naively asked about "transitional care," a type of care that had been a centerpiece of Homestead's marketing.  The administrator at the new company informed him that she had never heard of "transitional care," and that there are only four billing codes for hospice care – none of which is "transitional care."  At the end of the training period, Compassus told Mr. Cole that they thought "it wasn't a good fit," and so he did not return to work at the company.

### B.    The Homestead Hospice Defendants.

24.

Homestead Hospice is a community-based hospice.  According to the company's website, Homestead Hospice was founded in 2006 by Defendant Mallie Sharafat, who remains the company's Managing CEO.

25.

When Relator Cole left Homestead in 2014, the company had nearly 1000 hospice patients in the Atlanta area alone.  Homestead operates 19 hospice entities: 3 in Alabama, 2 in Arizona, 9 in Georgia, and 5 in South Carolina.

26.

*Homestead Hospice Management, LLC*:  Defendant Homestead Hospice Management, LLC, is a Georgia limited liability corporation with significant ownership and control over the Homestead hospice entities.  Its principal place of business is: 10888 Crabapple Rd., Roswell, GA 30075.  Its registered agent is Jere Wood and the address for service of process is: 1173 Canton Street, Fulton County, Roswell, GA  30075.  Upon proper service of the Summons and Complaint, Homestead Hospice Management, LLC will be subject to the jurisdiction of this Honorable Court.

Complaint

27.

Defendant Homestead Hospice Management, LLC has significant ownership and control over the other Defendants and is fully responsible for their conduct, as well as all injuries and damages caused by them, and all penalties, awards and judgments entered against them.

28.

In addition, Defendant Homestead Hospice Management, LLC has been unjustly enriched by the acts and omissions of the other Defendants and has maintained possession, custody or control of certain property or money which was unjustly obtained from government-funded healthcare programs and should have been reimbursed to the government-funded healthcare programs.

29.

*Homestead Palliative Care, Inc.*:      Homestead Palliative Care, Inc., is a Georgia corporation with a principal office address of 10888 Crabapple Rd., Roswell, GA, 30075. Its registered agent for service of process is Jere Wood, 1173 Canton St., Fulton, Roswell, GA, 30075. It is registered with the Arizona Corporation Commission with a domestic address of 414 W. Louis Way, Tempe, AZ 85284, and its statutory agent is named as Kianoush Rahbar, 414 W. Louis Way, Tempe, AZ 85284. It is registered with the State of Alabama, with a registered agent of Robert Weeks, 128 Front Street, Gilbertown, AL 36908. Upon

proper service of the Summons and Complaint, Homestead Palliative Care, Inc.,

will be subject to the jurisdiction of this Honorable Court.

30.

Defendant Homestead Palliative Care, Inc., has significant ownership and

control over the other Defendants and is fully responsible for their conduct, as well

as all injuries and damages caused by them, and all penalties, awards and

judgments entered against them.

31.

In addition, Defendant Homestead Palliative Care, Inc., has been unjustly

enriched by the acts and omissions of the other Defendants and has maintained

possession, custody or control of certain property or money which was unjustly

obtained from government-funded healthcare programs and should have been

reimbursed to the government-funded healthcare programs.

*32.*

*Creative Hospice Care, Inc.*:     Defendant Creative Hospice Care, Inc., is a

Georgia corporation with significant ownership and control over the Homestead

hospice entities.  Creative Hospice Care, Inc., has a place of business at 49 Spring

St., Newnan, GA 30263-2768. Upon proper service of the Summons and

Complaint, Creative Hospice Care, Inc., will be subject to the jurisdiction of this

Honorable Court.

33.

According to filings made with the Georgia Secretary of State, the corporation's principal place of business is 10888 Crabapple Rd., Roswell, GA 30075.  Its agent for service of process is Jere Wood, 1173 Canton Street, Fulton County, Roswell, GA  30075.  According to filings made in Alabama, Creative Hospice Care, Inc., is 39% owned by Defendant Mahlega Abdsharafat; 20% owned by the Abdsharafat Trust; and 20% owned by Eshage LLC.

34.

Creative Hospice Care, Inc., is the legal business name for Homestead Hospice & Palliative Care, which bills Medicare under National Provider Identification (NPI) 1003192477.

35.

Defendant Creative Hospice Care, Inc., has significant ownership and control over the other Defendants and is fully responsible for their conduct, as well as all injuries and damages caused by them, and all penalties, awards and judgments entered against them.

36.

In addition, Defendant Creative Hospice Care, Inc., has been unjustly enriched by the acts and omissions of the other Defendants and has maintained possession, custody or control of certain property or money which was unjustly

obtained from government-funded healthcare programs and should have been

reimbursed to the government-funded healthcare programs.

37.

*Creative Hospice Holding LLC*: Defendant Creative Hospice Holding LLC is

a Georgia limited liability corporation and is a member of Homestead Hospice of

Phoenix, LLC.  According to filings made with the Georgia Secretary of State,

Defendant Creative Hospice Holding LLC's principal place of business is 10888

Crabapple Rd., Roswell, GA 30075.  Its registered agent is Jere Wood and the

address for service of process is: 1173 Canton Street, Fulton County, Roswell, GA

30075.  Upon proper service of the Summons and Complaint, Creative Hospice

Holding LLC will be subject to the jurisdiction of this Honorable Court.

38.

Defendant Creative Hospice Holding LLC has significant ownership and

control over the other Defendants and is fully responsible for their conduct, as well

as all injuries and damages caused by them, and all penalties, awards and

judgments entered against them.

39.

In addition, Defendant Creative Hospice Holding LLC has been unjustly

enriched by the acts and omissions of the other Defendants and has maintained

possession, custody or control of certain property or money which was unjustly

obtained from government-funded healthcare programs and should have been reimbursed to government-funded healthcare programs.

40.

*Homestead Hope Foundation, Inc.*:    Defendant Homestead Hope Foundation, Inc., is a Georgia nonprofit corporation.  Its principal office address is 10888 Crabapple Road, Roswell, GA  30075.  Its registered agent for service of process is Jere Wood, 1173 Canton Street, Fulton County, Roswell, GA  30075. Upon proper service of the Summons and Complaint, this entity will be subject to the jurisdiction of this Honorable Court.

41.

Defendant Homestead Hope Foundation, Inc., has significant ownership and control over the other Defendants and is fully responsible for their conduct, as well as all injuries and damages caused by them, and all penalties, awards and judgments entered against them.

42.

In addition, Defendant Homestead Hope Foundation, Inc., has been unjustly enriched by the acts and omissions of the other Defendants and has maintained possession, custody or control of certain property or money which was unjustly obtained from government-funded healthcare programs and should have been reimbursed to the government-funded healthcare programs.

43.

In addition, Homestead Hope Foundation, Inc., has conspired with the other Defendants to create a kickback scheme in order to generate healthcare business referrals for the other Defendants.

44.

In addition, Homestead Hope Foundation, Inc., has illegally used its non-profit status to generate healthcare business referrals for the other Defendants.

**Alabama**

45.

*Homestead Hospice of Cahaba LLC*:   Defendant Homestead Hospice of Cahaba LLC is an Alabama limited liability corporation.  In April 2016, a Georgia corporation called Homestead Hospice of Southwest Alabama, LLC, was merged into surviving entity Homestead Hospice of Cahaba LLC.  The surviving entity's registered agent for service of process is Weeks, Powers, and the registered office street address is 128 Front St., Gilbertown, AL 36908.  Upon proper service of the Summons and Complaint, this entity will be subject to the jurisdiction of this Honorable Court.

46.

*Homestead Hospice of Southern Alabama LLC*:      Defendant Homestead Hospice of Southern Alabama LLC is an Alabama limited liability corporation with

a place of business at 116 Edwina St., Evergreen, AL 36401-3319.  Its registered

agent for service of process is Robert P. Weeks, and the address for service of

process is 128 Front St., Gilbertown, AL 36908.  Upon proper service of the

Summons and Complaint, this entity will be subject to the jurisdiction of this

Honorable Court.

47.

*Homestead Hospice of Southwest Alabama, LLC*:   Defendant Homestead

Hospice of Southwest Alabama, LLC is a Georgia limited liability corporation with

a place of business at 116 Edwina St., Evergreen, AL 36401-3319.  Its registered

agent for service of process in Georgia is Jere Wood, and the address for service of

process is 1173 Crabapple Rd., Fulton County, Roswell, GA 30075.  Its registered

agent for service of process in Alabama is Robert P. Weeks, and the address for

service of process is 128 Front St., Gilbertown, AL 36908.  Upon proper service of

the Summons and Complaint, this entity will be subject to the jurisdiction of this

Honorable Court.

**Arizona**

48.

*Creative Hospice & Palliative Care of Arizona, Inc.*:        Defendant

Creative Hospice & Palliative Care of Arizona, Inc., is an Arizona corporation.  Its

domestic address given to the Arizona Secretary of State is 312 N. Alma School

Rd. #11, c/o 10888 Crabapple Rd., Roswell, GA. 30075, Chandler, AZ 85224.  Its

registered agent for service of process is Kianoush Rahbar and the address for

service of process is: 414 W Louis Way, Tempe, AZ 85284.  Upon proper service

of the Summons and Complaint, Creative Hospice & Palliative Care of Arizona,

Inc., will be subject to the jurisdiction of this Honorable Court.

49.

Defendant Homestead Hospice Palliative Care of Maricopa LBN Creative

Hospice Care of Arizona, Inc., a/k/a Creative Hospice & Palliative Care of

Arizona, Inc., has places of business at 14800 W Mountain View Blvd., Suite 210,

Surprise, AZ, 85374-4795, and 312 N Alma School Rd., Suite 11, Chandler, AZ

85224.  Its domestic address given to the Arizona Secretary of State is Creative

Hospice & Palliative Care of Arizona, Inc., 312 N. Alma School Rd. #11, Chandler,

AZ 85224, c/o 10888 Crabapple Rd., Roswell, GA  30075.  Its registered agent for

service of process is Kianoush Rahbar and the address for service of process is:

414 W Louis Way, Tempe, AZ 85284.  Upon proper service of the Summons and

Complaint, this entity will be subject to the jurisdiction of this Honorable Court.

50.

*Defendant Homestead Hospice of Phoenix LLC*:     Defendant Homestead

Hospice of Phoenix LLC is an Arizona limited liability corporation with a

domestic address of 14800 W Mountain View Blvd., Surprise, AZ 85374.  Its

registered agent for service of process is LegalInc Corporate Services Inc., and the address for service of process is: 2 E Congress St., Ste. 900A, Tucson, AZ 85701. Upon proper service of the Summons and Complaint, this entity will be subject to the jurisdiction of this Honorable Court.

## Georgia

51.

*Homestead Hospice of Blairsville, LLC*:    Defendant Homestead Hospice of Blairsville, LLC is a Georgia limited liability corporation with a place of business at 97 Deep South Farm Rd., Blairsville, GA 30512-2298. In filings made with the Georgia Secretary of State, the company states that its principal office address is 10888 Crabapple Rd., Roswell, GA, 30075.  Its registered agent for service of process is Jere Wood and the address for service of process is: 1173 Canton Street, Fulton County, Roswell, GA  30075.  Upon proper service of the Summons and Complaint, this entity will be subject to the jurisdiction of this Honorable Court.

52.

*Homestead Hospice of Cartersville, LLC*:    Defendant Homestead Hospice of Cartersville, LLC, formerly known as Creative Hospice and Palliative Care of Marietta, Inc., is a Georgia limited liability corporation with an office at 1 North Tennessee St., Cartersville, GA 30120.  Its principal office address, as provided to

the Georgia Secretary of State, is 10888 Crabapple Rd., Roswell, GA 30075.  Its

registered agent for service of process is Jere Wood and the address for service of

process is: 10888 Crabapple Road, Fulton, Roswell, GA, 30075.  Upon proper

service of the Summons and Complaint, this entity will be subject to the

jurisdiction of this Honorable Court.

53.

Defendant Homestead Hospice of Marietta LBN Creative Hospice Palliative

Care of Marietta, Inc., is a d/b/a name for Defendant Homestead Hospice of

Cartersville, LLC, and has its place of business at 1301 Shiloh Rd. NW, Suite 810,

Kennesaw, GA 30144-7147.

54.

*Homestead Hospice of Central Georgia LLC*:        Defendant Homestead

Hospice of Central Georgia LLC is a Georgia limited liability corporation and has

a place of business at 500 Osigian Blvd., Suite 300, Warner Robins, GA 31088-

8995.  Its principal office address, as provided to the Georgia Secretary of State, is

10888 Crabapple Rd., Roswell, GA 30075.  Its registered agent for service of

process is Jere Wood and the address for service of process is: 1173 Canton Street,

Fulton County, Roswell, GA 30075.  Upon proper service of the Summons and

Complaint, this entity will be subject to the jurisdiction of this Honorable Court.

55.

*Homestead Hospice of Northwest Georgia LLC*:    Defendant Homestead Hospice of Northwest Georgia LLC is a Georgia limited liability corporation with a place of business at 1514 W Walnut Ave., Suite 3, Dalton, GA  30721-4430. Its principal office address, as provided to the Georgia Secretary of State, is 10888 Crabapple Rd., Roswell, GA 30075.  Its registered agent for service of process is Jere Wood and the address for service of process is: 1173 Canton Street, Fulton County, Roswell, GA 30075.  Upon proper service of the Summons and Complaint, this entity will be subject to the jurisdiction of this Honorable Court.

## South Carolina

**56.**

*Homestead Hospice of Charleston LLC*:    Defendant Homestead Hospice of Charleston LLC is a South Carolina limited liability corporation with its place of business at 7410 Northside Dr., Suite 101, Charleston, SC 29420.  Its registered agent for service of process is Anne Durant and the address for service of process is 3453 Pelham Rd., Ste. 107, Greenville, SC 29615. Upon proper service of the Summons and Complaint, this entity will be subject to the jurisdiction of this Honorable Court.

57.

*Homestead Hospice of Columbia LLC*:        Defendant Homestead Hospice

of Columbia LLC is a South Carolina  limited liability corporation with its place of

business at 7825 Broad River Rd., Suite 100, Irmo, SC 29063.  Its registered agent

for service of process is Anne Durant and the address for service of process is:

3453 Pelham Rd., Ste. 107, Greenville, SC 29615.  Upon proper service of the

Summons and Complaint, this entity will be subject to the jurisdiction of this

Honorable Court.

58.

*Homestead Hospice of Florence, Inc.*: Homestead Hospice of Florence, Inc.,

is a South Carolina limited liability corporation with its place of business at: 2405

Second Loop Rd., Florence, SC 29501.  Its registered agent for service of process

is Anne Durant and the address for service of process is: 3452 Pelham Rd., Ste.

107, Greenville, SC 29615.  Upon proper service of the Summons and Complaint,

this entity will be subject to the jurisdiction of this Honorable Court.

59.

*Homestead Hospice of Greenville LLC*:        Defendant Homestead Hospice

of Greenville LLC, is a South Carolina limited liability corporation with its place

of business at 109 Laurens Rd., Building 1A, Greenville, SC 29607.  Its registered

agent for service of process is CT Corporation and the address for service of

process is: CT Corporation, 2 Office Park Ct., Ste. 103, Columbia, SC  29223.

Upon proper service of the Summons and Complaint, this entity will be subject to

the jurisdiction of this Honorable Court.

60.

*Homestead Hospice of Spartanburg, Inc.*:      Homestead Hospice of

Spartanburg, Inc., is a South Carolina limited liability corporation with a place of

business at: 109 Laurens Rd., Building 1A, Greenville, SC 29607. Its registered

agent for service of process is Anne Durant and the address for service of process

is: 3453 Pelham Rd., Ste. 107, Greenville, SC 29615.  Upon proper service of the

Summons and Complaint, this entity will be subject to the jurisdiction of this

Honorable Court.

**<u>Other</u>**

61.

*Mahlega Abdsharafat, a/k/a Mallie Sharafat*: Mahlega Abdsharafat, a/k/a

Mallie Sharafat, is the President and CEO of Homestead Hospice and also the 39%

owner of Creative Hospice Care, Inc.  Ms. Abdsharafat's residential address is 215

Bunratty Court, Fulton County, Roswell, GA 30076.  Upon proper service of the

Summons and Complaint, Ms. Abdsharafat will be subject to the jurisdiction of

this Honorable Court.

62.

*Abdsharafat Trust*:        The Abdsharafat Trust is a 20% owner of Creative

Hospice Care, Inc., and is 100% owned by A.S.M., a minor.  In filings in Alabama,

the trust provided its address as 215 Bunratty Court, Fulton County, Roswell, GA

30076, which is the residential address of Defendant Mallie Sharafat.  Upon proper

service of the Summons and Complaint, the Abdsharafat Trust will be subject to

the jurisdiction of this Honorable Court.  The Abdsharafat Trust is not registered

with the State of Georgia, and therefore may be served with process in accordance

with the laws of the State of Georgia.

63.

*Eshag LLC*:        Eshag LLC is a 20% owner of Creative Hospice Care,

Inc.  Eshag LLC is a Georgia limited liability corporation with its principal office

address at 90 Park View Trace, Lilburn, Georgia 30047.  Its registered agent is

Hamid Bakhtiari and its principal office address and the address for service of

process is 90 Park View Trace, Lilburn, Georgia 30047.  Upon proper service of

the Summons and Complaint, Eshag LLC will be subject to the jurisdiction of this

Honorable Court.

64.

The Defendants listed above either bill government-funded healthcare

programs or have significant ownership and control over other defendants who do

so, and are fully responsible for the conduct of these other defendants, as well as all injuries and damages caused by them, and all penalties, awards and judgments entered against them.

65.

In addition, the Defendants listed above either bill government-funded healthcare programs or have been unjustly enriched by the acts and omissions of the other defendants who do so, and have maintained possession, custody or control of certain property or money which was unjustly obtained from government-funded healthcare programs and should have been reimbursed to those programs.

66.

Collectively, the Defendants will be referred to as "Homestead" or "Homestead Hospice."

## II.    THE LAW RELATED TO THE CASE.

### 67.

Hospice care began as an altruistic movement in the 1970s, but it has since become big business.  In 2012, Medicare spent $14.9 billion on hospice care. Blum and Loeffler, NHCPO's 29th Management and Leadership Conference, CMS,

at 3 (3/25/2014), *available at* https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/Hospice/Downloads/March-2014-NHPCO-Slides.pdf.

68.

As with every other Medicare program, Medicare will not pay for hospice services unless the hospice complies with Medicare regulations and certifies that the services are "reasonable and necessary."  With hospice care, one or more physicians have to certify that the patient needs the care.  Additionally, by statute a medical provider cannot offer "remuneration" in order to get government-funded healthcare business.

**A.    General Information About the Medicare/Medicaid Programs.**

69.

In 1965, Congress enacted Title XVIII of the Social Security Act to pay for certain healthcare costs.  42 U.S.C. § 1395, *et seq*.  Today federal dollars pay for Medicare, and the state and federal governments split the cost of Medicaid, which was established by Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v. The Centers for Medicare & Medicaid Services ("CMS"), which is a part of the Department of Health and Human Services ("HHS"), administers Medicare and works with the individual states on the Medicaid program.

70.

Providers who want a piece of the federal- or state-funded healthcare pie have to become participating providers, and in order to be paid, they must agree to abide by the rules, regulations, policies and procedures governing claims for payment.  Providers also have to agree to maintain records and to allow the government to access those records and information as needed.

**B.    <u>General Rules that Apply to Hospice Providers.</u>**

71.

Medicare will only pay for hospice services that are reasonable and necessary, for patients who have a life expectancy of 6 months or less.  Hospices must maintain records that support the care and diagnosis, and must bill properly.

**1.    *Medicare Will Not Pay for Hospice Services That Are Not "Reasonable and Necessary."***

72.

As a universal rule, Medicare and Medicaid will only pay for services that are reasonable and medically necessary.  *See* 42 U.S.C. § 1395y(a)(1)(A); 42 U.S.C. § 1396, *et seq.*; 42 C.F.R. § 410.50.

73.

Medicare regulations state quite specifically that, as with all other types of services: "no payment may be made" for hospice care services "which are not

**reasonable and necessary for the palliation or management of terminal illness**." 42 U.S.C. § 1395y(a)(1)(C) (emphasis added).

74.

To try to ensure that it only pays for reasonable and necessary hospice services, Medicare specifies that: "payment for services furnished an individual may be made only to providers of services which are eligible therefor under section 1395cc of this title" and only if two different doctors certify, in writing, "that the individual is terminally ill . . . based on the physician's or medical director's clinical judgment regarding the normal course of the individual's illness." 42 U.S.C. § 1395f(a)(7)(A)(i). The hospice medical director or the physician member of the hospice interdisciplinary group and the individual's attending physician have to sign the first certification; after that initial certification, either the physician member or the physician member of the hospice interdisciplinary group may sign the new certification. 42 C.F.R. § 418.22(c).

75.

Written certifications must be made in the admitted patient's medical records. *See id.* at § 418.22(d)(2). The certification has to be accompanied by "clinical information and other documentation that support the medical prognosis." 42 C.F.R. § 418.22(b).

76.

The first certification is good for 90 days, and the second for another 90 days.  After that, the care moves into a series of 60-day periods; with each new period, a physician has to certify that the patient is expected to die within 6 months or less.

### 2.     The Patient Must Have a Life Expectancy of 6 Months or Less.

77.

OIG has a very clear standard for who can receive hospice care: "For a hospice patient to receive reimbursement for hospice services under Medicare, the patient must be 'terminally ill.'"  OIG Compliance Program Guidance for Hospices (Oct. 1999), *available at* http://oig.hhs.gov/authorities/docs/hospicx.pdf.  *See* 42 C.F.R. § 418.20.  "Terminally ill means that the individual has a medical prognosis that his or her life expectancy is 6 months or less if the illness runs its normal course."   42 C.F.R. § 418.3.  "Hospices should create oversight mechanisms to ensure that the terminal illness of a Medicare beneficiary is verified . . ." OIG Compliance Program Guidance for Hospices (Oct. 1999), *available at* http://oig.hhs.gov/authorities/docs/hospicx.pdf.

78.

OIG has to be especially strict about when hospice care may be given because patients give up something significant when they enroll in hospice care: the patient must agree to revoke his right to receive Medicare services that could

cure him.  While hospice covers services that regular Medicare does not, those

services are limited to palliative care, or services designed to relieve the patient's

pain, symptoms and stress as death imminently approaches.  If the patient changes

his mind and revokes hospice care, he can regain his right to normal Medicare

coverage — but then he has to wait until the end of the first hospice coverage

period before he can reclaim the hospice care benefit.  *See* 42 C.F.R. § 418.28.

### 3.    *Record-keeping.*

79.

Hospices are required to maintain a clinical record for each hospice patient

that contains "correct clinical information."  All entries in the clinical record must

be "legible, clear, complete, and appropriately authenticated and dated ... " 42

C.F.R. § 418.104.

80.

In reaching a decision to certify that the patient is terminally ill, the hospice

medical director must consider diagnosis of the terminal condition of the patient,

other health conditions, and all current clinically relevant information supporting

the patient's diagnoses. *See* 42 C.F.R. § 418.25(b).  The physician "must include a

brief narrative explanation of the clinical findings that supports a life expectancy of

6 months or less."  42 C.F.R. § 418.22(b)(3).  "The narrative must reflect the

patient's individual clinical circumstances and cannot contain check boxes or

standard language used for all patients." 42 C.F.R. § 418.22(b)(3)(iv).  Medicare

will not pay for hospice services unless all of these regulations are met.

### 4.    The Billing and Payment System.

81.

Medicare is divided into four parts labeled A, B, C and D.  Hospice care is

covered under Part A.  *See* 42 U.S.C. §§ 1395c-1395i-4.

82.

Hospices are paid a per diem rate based on the number of days and level of

care provided.  *See* Policy Manual, Ch. 9, § 40; 42 C.F.R. § 418.302.  Those

submissions contain information such as the patient's name and Medicare

beneficiary identifier, principal diagnosis, dates of services, level of service,

condition codes, and discharge status.  Medicare relies on the accuracy and

truthfulness of those claims in determining the proper amount of reimbursement

for hospices.

83.

CMS contracts with "carriers", also known as fiscal intermediaries, to

process Part A claims and pay providers on CMS' behalf.  42 U.S.C. § 1395u.

Homestead and other hospices bill Medicare by submitting claim forms, via paper

or, more usually, via the Fiscal Intermediary Standard System (FISS).  The forms

are submitted to the fiscal intermediary responsible for administering Medicare

hospice claims on behalf of the United States.

84.

The Medicare intermediary processing hospice claims for Georgia, Alabama

and South Carolina is Palmetto GBA, LLC.

85.

The Medicare intermediary processing hospice claims for Arizona is

National Government Services, Inc.

86.

To bill continuous care, Homestead and other hospices use revenue code

0652 on Claim Page 02 (Map 1712).  Each day of continuous care must be billed

on a separate revenue code line. The claim form must include information related

to the patient, the services provided, and the provider.

87.

If a medical provider realizes it has received an overpayment from

Medicare, but does not return the money within 60 days, it is liable under the False

Claims Act.  *See* 42 U.S.C. § 1320a-7k(d).

### C.    As a Condition of Payment, Homestead Repeatedly Certified that It Was Complying with the AKS and Other Medicare Rules.

88.

Before Homestead could participate in government-funded healthcare programs, it had to certify that it was complying with Medicare's rules and regulations.  Then, each time Homestead made a claim for payment, it had to certify that it was continuing to comply and was not concealing any material facts.

89.

*Initial enrollment application and updates.*  When a provider enrolls with Medicare, it must sign an initial enrollment application, and from time to time it must submit new ones "as part of the periodic revalidation process."  Certification Statement, Sec. 5, CMS Form 855, Medicare Enrollment Application, Institutional Providers, *available at* https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/downloads/ cms855a.pdf.  As part of the agreement, the provider certifies that Medicare's payments are conditional:

> 3.    I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction **complying with such laws, regulations, and program instructions** (including, but not limited to, ***the Federal anti-kickback statute*** and the Stark law), and on the provider's compliance with ***all applicable conditions of participation in Medicare***.
> *    *    *
> 6.    I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

*Id.* (emphasis added).

90.

After the initial certification, the company, through its officers, has an

***ongoing duty*** to tell Medicare if anything on the form becomes untrue or

inaccurate:

> If I become aware that any information in this application is not true, correct,
> or complete, I agree to notify the Medicare fee-for-service contractor of this
> fact in accordance with the time frames established in 42 C.F.R. §
> 424.516(e).
> *   *   *
> I agree to notify the Medicare contractor of any future changes to the
> information contained in this application in accordance with the time frames
> established in 42 C.F.R. § 424.516(e).

*Id.*

91.

"The State of Georgia similarly requires providers to certify compliance

with both federal laws relating to Medicaid, which would include the Anti-

Kickback Statute, as well as state program provisions prohibiting the payment of

kickbacks."  Statement of Interest of the U.S. in Response to Tenet Defendants'

Motion to Dismiss, *U.S. ex rel. Williams v. Health Management Associates, Inc.*,

3:09-CV-130 (M.D. Ga.) (12/16/2013).

92.

***Statements made with each claim.***  In addition to the initial and ongoing

certifications, each time a provider submits a claim, the submission must state, in

boldface type:

> (1)  "This is to certify that the foregoing information is true, accurate, and complete."
> (2)  "I understand that payment of this claim will be from Federal and State funds, and that any falsification, or concealment of a material fact, may be prosecuted under Federal and State laws."

42 C.F.R. § 455.18(a).  Lest anyone miss the certification, either the statements themselves or a reference to them "must appear immediately preceding the claimant's signature."  *Id.* at (b).

93.

The certification has to be made whether the provider submits a claim electronically or on paper: "The provider agrees to the following provisions for submitting Medicare claims electronically . . . That it will submit claims that are accurate, complete, and truthful."  Medicare Claims Processing Manual, Ch. 24, § 30.2 A, *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/ Manuals/downloads/clm104c24.pdf.

94.

For each individual claim, Homestead and other providers must submit CMS Form 1450.  UB-04 Uniform Bill, CMS Form 1450 (03/01/2007), *available at* https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/CMS-Forms-Items/CMS1196256.html.  On the front side, the provider fills in data such as the name of the patient, the type of service provided, the total charges, and the date of the service.  At the bottom of the page, the document warns: "The certifications on

the reverse apply to this bill and are made a part hereof."  The flip side of the bill

details what a provider certifies when it submits a bill: "The submitter of this form

understands that misrepresentation or falsification of essential information as

requested by this form, may serve as the basis for civil monetary penalties and

assessments and may upon conviction include fines and/or imprisonment under

federal and/or state law(s)."  The bill also explains: "Submission of this claim

constitutes certification that . . . [t]he submitter did not knowingly or recklessly

disregard or misrepresent or conceal material facts."

### D.    Congress Has Forbidden Kickbacks for Medicare Referrals.

95.

While rewarding referral sources is customary in some industries, it is

specifically prohibited in the healthcare field by the Anti-Kickback Statute

("AKS").  The AKS was intended to prevent healthcare costs from being driven

ever higher as medical providers built kickback costs into their prices.

96.

Hospice providers must certify that they have complied with the Anti-

Kickback Statute, and additionally Congress has provided that: "a claim that

includes items or services resulting from a violation of this section constitutes a

false or fraudulent claim for purposes of [the False Claims Act]."  42 U.S.C. §

1320a-7b(g).

### 1.    *The Anti-Kickback Statute.*

97.

According to Health and Human Services: "The AKS is a criminal law that prohibits the knowing and willful payment of '**remuneration**' to induce or reward patient referrals or the generation of business involving any item or service payable by the Federal health care programs (e.g., drugs, supplies, or health care services for Medicare or Medicaid patients)." *A Roadmap for New Physicians: Fraud and Abuse Laws*, Physician Education, OIG Compliance (last visited on 12/15/2016), *available at* https://oig.hhs.gov/compliance/physician-education/roadmap_web_version.pdf (emphasis added).

98.

The AKS provides:

**(1)** Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind--
> **(A)** in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
> **(B)** in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $ 25,000 or imprisoned for not more than five years, or both.

**(2)** Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person —

> **(A)** to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
> **(B)** to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $ 25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b).

99.

Violators can be assessed a civil monetary penalty of up to $50,000 for each false record or statement plus three times the amount of the claim for payment under the federal health program, and may be excluded from participating in any federal health program.  42 U.S.C. § 1320a-7a(a).  The Anti-Kickback Statute applies to any "Federal health care program," which includes both Medicare and Medicaid.   42 U.S.C. § 1320a-7b(f)(1)-(2).

100.

Hospices are subject to the AKS, and as far back as 1998, OIG put out a "Special Fraud Alert" pinpointing some "potentially illegal practices" (kickbacks) that might tend to occur between nursing homes and hospices:

>Specific practices which are suspected kickbacks include:
>* A hospice offering free goods or goods at below fair market value
>to induce a nursing home to refer patients to the hospice.

*Fraud and Abuse in Nursing Home Arrangements with Hospices*, OIG Special

Fraud Alert (Mar. 1998), *available at* http://oig.hhs.gov/fraud/docs/

alertsandbulletins/hospice.pdf.  *See also* Connie Raffa, Arent Fox, *Home Health*

*and Hospice Compliance and Marketing Practices Under Florida and Federal*

*Law*, Health Care Compliance Association 15th Annual Compliance Institute (Apr.

11, 2011) (OIG concerned about hospices "[p]roviding services for free or reduced

rate to the patient, or potential patient/family.")

a.    Remuneration is defined broadly as "anything of value".

101.

Remuneration means "anything of value in any form whatsoever."  OIG

Anti-Kickback Provisions, 56 Fed. Reg. 35952, 35958 (1991).  "For purposes of

the anti-kickback statute, 'remuneration' includes the transfer of **anything of**

**value**, directly or indirectly, overtly or covertly, in cash or in kind.  The statute has

been interpreted to cover any arrangement where **one purpose** of the remuneration

was to obtain money for the referral of services or to induce further referrals."

OIG Advisory Opinion No. 12-17 at 4 (11/2/2012) (emphasis added).

"Remuneration includes anything of value and can take many forms besides cash,

such as free rent, expensive hotel stays and meals, and excessive compensation for

medical directorships or consultancies." *A Roadmap for New Physicians: Fraud and Abuse Laws*, Physician Education, OIG (last visited on 12/15/2016), *available at* https://oig.hhs.gov/compliance/physician-education/roadmap_web_version.pdf (emphasis added.)

102.

The AKS makes it illegal to use business solicitation methods that may be standard in other industries:

> Providers like to acknowledge their relationship with good referral sources and thank them for the patients they send to the provider. These acknowledgements can include dinner at a nice restaurant, tickets to a play or sporting event, or other items to say thanks. It can also include candy, wine, coffee or any number of gifts sent at Christmas time.
>
> For health care providers, acknowledging customers or referral sources with a gift is a violation of the Anti-Kickback statute. The gift is an item that has some value. The provider is giving the item as a reward for the referrals provided or as an inducement for future referrals. Providing anything of value as a reward for referring reimbursable care is strictly prohibited by the Anti-Kickback statute. Providing items of value to patients as an inducement to select the provider for reimbursable services violates the CMP statute. . . .

Robert W. Markette, Jr., *Home Health and Hospice Marketing: Some Common Practices That Shouldn't Be So Common*, Indiana Association for Home & Hospice Care, Inc. (Jan. 2007).

b.     The AKS applies to both paying and receiving kickbacks.

103.

The AKS attacks both sides of the kickback equation, "the payers of kickbacks - those who offer or pay remuneration - as well as the recipients of kickbacks - those who solicit or receive remuneration." *A Roadmap for New Physicians: Fraud and Abuse Laws*, Physician Education, OIG Compliance (last visited on 12/15/2016), *available at* https://oig.hhs.gov/compliance/physician-education/roadmap_web_version.pdf (emphasis added.)

c.     Actual Knowledge and Specific Intent Are Not Required.

104.

Although the defendant must have acted "knowingly and willfully," "a person need not have actual knowledge of this section or specific intent to commit a violation of this section."  42 USCS § 1320a-7b(h).

d.     The AKS Applies Regardless of Whether Patients Were Actually Harmed or the Government Actually Lost Money.

105.

"The Government does not need to prove patient harm or financial loss to the programs to show that a physician violated the AKS. A physician can be guilty of violating the AKS even if the physician actually rendered the service and the service was medically necessary." *A Roadmap for New Physicians: Fraud and*

*Abuse Laws*, Physician Education, OIG Compliance (last visited on 12/15/2016),

*available at* https://oig.hhs.gov/compliance/physician-education/roadmap_web_

version.pdf (emphasis added).

<u>e.    Gifts to Beneficiaries Are Also Illegal.</u>

106.

In addition to the AKS, the Social Security Act has a specific provision that

forbids offering remuneration to beneficiaries or potential beneficiaries:

> Section 1128A(a)(5) of the Act provides for the imposition of civil
> monetary penalties against any person who offers or transfers
> remuneration to a Medicare or State health care program (including
> Medicaid) beneficiary that the benefactor knows or should know is
> likely to influence the beneficiary's selection of a particular provider,
> practitioner, or supplier of any item or service for which payment may
> be made, in whole or in part, by Medicare or a State health care
> program (including Medicaid). The OIG may also initiate
> administrative proceedings to exclude such party from the Federal
> health care programs. Section 1128A(i)(6) of the Act defines
> "remuneration" for purposes of section 1128A(a)(5) as including
> "transfers of items or services for free or for other than fair market
> value."

OIG Advisory Opinion No. 12-17 at 4 (11/2/2012).

## 2.    *Why the AKS Law is So Important.*

107.

When a private business rewards a referral source, it can compare the

expense to the business benefits.  But when kickbacks occur in the medical field,

the costs of the services are borne by one party (Medicare) while the rewards go to

a completely different party (the provider seeking business).  Medicare concludes

that the likely outcome is: "Overutilization; Increased program costs; Corruption of

medical decisionmaking; Patient steering; [and] Unfair competition." *A Roadmap*

*for New Physicians: Fraud and Abuse Laws*, Physician Education, OIG

Compliance (last visited on 12/15/2016), *available at* https://oig.hhs.gov/

compliance/physician-education/roadmap_web_version.pdf (emphasis added.)  For

that reason, while "[i]n some industries, it is acceptable to reward those who refer

business to you…, in the Federal health care programs, paying for referrals is a

crime." *Id.*

108.

*Overutilization and Inflation of costs.*  Kickbacks encourage unnecessary

medical services and inflate the amount the government must pay for healthcare

services:

> The entire premise underlying the reimbursement scheme in federal
> health insurance programs is that medical services are provided only
> where they are "reasonable and necessary" for treatment. Kickbacks
> fundamentally undermine that premise. By creating financial
> incentives that compromise the integrity of medical providers'
> independent professional judgment, kickbacks encourage unnecessary
> medical services and, at a minimum, inflate the costs of services to the
> government.

Statement of Interest of U.S. in Response to Tenet Defendants' Motion to Dismiss,

*U.S. ex rel. Williams v. Health Management Associates, Inc.*, 3:09-CV-130 (M.D.

Ga.) at 15 (12/16/2013).

> The prohibition against kickbacks is not just a technical requirement, but instead is a core prerequisite for payment whose violation eviscerates the value of the service the government has bargained for: an unbiased determination by a medical provider that a certain medical procedure, device, or drug is "reasonable and necessary" for the treatment of a patient.

*Id.* at 15.

109.

*Corruption of Decision-Making and Patient Steering.* By interfering with doctors' decision-making, kickbacks can result in poor care for patients. When a provider recommends medical care, and in particular hospice care, that decision by its very nature should be intimately personal and individualized. Kickbacks, however, shift the focus: "Offering valuable gifts to beneficiaries to influence their choice of a Medicare or Medicaid provider raises quality and cost concerns. Providers may have an economic incentive to offset the additional costs attributable to the giveaway by providing unnecessary services or by substituting cheaper or lower quality services." *Offering Gifts and Other Inducements to Beneficiaries*, OIG Special Advisory Bulletin (Aug. 2002).

110.

*Unfair Competitive Advantage.* Kickbacks and giveaways also put small providers – or those who are unwilling to break the rules -- at a competitive disadvantage. "The use of giveaways to attract business also favors large providers with greater financial resources for such activities, disadvantaging smaller

providers and businesses."  Special Advisory Bulletin, OIG, Offering Gifts and

Other Inducements to Beneficiaries (Aug. 2002).

## III.    **HOMESTEAD HOSPICE DEFRAUDED THE GOVERNMENT.**

### 111.

Homestead engaged in three, separate types of fraud.  First, it billed the

Government for unreasonable and unnecessary "continuous home care" - the most

expensive form of care.  Second, Homestead built its business on a constellation of

kickbacks.  Third, Homestead admitted patients who were not in the last six

months of life and were not eligible for hospice care.

### 112.

On information and belief, government-funded programs pick up nearly the

entire tab for this fraud.  Medicare pays for hospice care for approximately 96% of

Homestead's patients, and Medicaid picks up the tab for another 2%.  The

remaining 2% of patients are covered by sources such as private insurance or

smaller, government-funded healthcare programs.

### A.    Homestead Billed Unauthorized, Unnecessary, "Continuous Care".

113.

While most people tend to think of "hospice care" as a single type of care, Medicare divides it into four categories.  The most intensive form of hospice is "continuous home care," also known as "CHC," and Medicare pays 5 times as much for CHC as for the three other types of care.  CHC is reserved for **crisis situations only**.

114.

Ignoring Medicare's rules, Homestead beefed up its continuous care reimbursements was by providing continuous care to patients who did not need it.  For example, Homestead offered continuous care to every single patient who was discharged from a hospital, regardless of whether the patient needed it.

### 1.    *What "Continuous Care" Should Be.*

115.

CHC is expensive, one-on-one care, and consequently it is supposed to be rare.  Indeed, nationally only 0.5% of hospice "patient care days" were billed as CHC in 2012, and 0.8% in 2013.  *See Hospice Care in America*, National Hospice and Palliative Care Organization's Facts and Figures (2014 ed.), *available at* http://www.nhpco.org/sites/default/files/public/Statistics_Research/2014_Facts_Figures.pdf.

Complaint

### a.    CHC is Extremely Expensive for Medicare and Extremely Profitable for Hospices.

116.

In 2016, Medicare will pay a hospice $944.79 for every day it provides

continuous home care — five times the $186.84 rate Medicare pays the hospice

when it is merely giving routine care.  *Update to Hospice Payment Rates*

(9/4/2015), MLN Matters, *available at* https://www.cms.gov/Outreach-and-

Education/Medicare-Learning-Network-MLN/MLNMattersArticles/Downloads/

MM9301.pdf. The idea behind the big-bucks payments is that the patient needs

very intensive care, on a temporary basis, to resolve a crisis. Medicare has not

agreed – could not afford to agree – to reimburse all hospice care at the higher rate.

If hospices bill that level of care for patients who do not need it, Medicare quickly

will become unable to afford that level of care for anyone, even those patients who

desperately need it.

### b.    Medicare Strictly Limits the Use of Continuous Home Care.

**117.**

Because Medicare pays such a high rate for CHC, it also has strict

regulations about when a hospice can use CHC.

47

118.

**(1)      Brief periods of medical crisis.**  First and foremost, "[c]ontinuous home care is only furnished during brief periods of crisis and covered only as necessary to maintain the terminally ill individual at home."  Medicare Benefit Policy Manual (CMS Pub. 100-02) Ch. 9, § 40.2.1 (Rev. 188, Issued: 05-01-14; Effective: 08-04-14; Implementation: 08-04-14).  *See also id.* ("Continuous home care may be provided only during a period of crisis as necessary to maintain an individual at home."); Medicare Claims Processing Manual (CMS Pub. 100-02) Ch. 11, § 30.1, *available at* https://www.cms.gov/Regulations-and-Guidance/ Guidance/Manuals/downloads/ clm104c11.pdf ("This rate is paid only during a period of crisis and only as necessary to maintain the terminally ill individual at home.").

119.

The fact that the patient is dying is a reason to put the patient on hospice, but not to provide ultra-expensive "continuous care."  CHC is "not appropriate" even for "a patient who is imminently dying" unless the patient has "acute skilled pain or symptom management needs."  *Managing Continuous Home Care for Symptom Management: Tips for Providers*, National Hospice & Palliative Care Organization 2011, *available at* http://www.nhpco.org/sites/default/files/public/ regulatory/CHC_Tip_sheet.pdf (last viewed on 03/25/2016).

120.

**(2)    Palliation and management of acute medical symptoms.**  "A period

of crisis is a period in which a patient requires continuous care which is

predominantly nursing care to achieve palliation or management of acute medical

symptoms."  Medicare Benefit Policy Manual (CMS Pub. 100-02) Ch. 9 § 40.2.1

(Rev. 188, Issued: 05-01-14; Effective: 08-04-14; Implementation: 08-04-14).  *See*

*also* 42 C.F.R. § 418.204(a).

121.

**(3)    Furnished where the patient lives.**  CHC is only furnished *where the*

*patient lives* (which could mean an assisted living facility or a long-term care

facility, as well as a private residence): "The hospice is paid the continuous home

care rate when continuous home care is provided in the patient's home."  The idea

behind CHC is that the patient needs skilled nursing care on a temporary basis and

he is not getting it anywhere else.  For that reason, "[c]ontinuous home care is not

paid during a hospital, skilled nursing facility or inpatient hospice facility stay."

Medicare Claims Processing Manual (CMS Pub. 100-02) Ch. 11, § 30.1, *available*

*at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/

clm104c11.pdf.  Medicare reasons that it is already paying for nursing care if the

patient is in a hospital or skilled nursing facility, so CHC would be redundant.

122.

**(4)    Reimbursed hourly.**  "For continuous home care the amount of payment is determined based on the number of hours, reported in increments of 15 minutes, of continuous care furnished to the beneficiary on that day."  Medicare Claims Processing Manual (CMS Pub. 100-02) Ch. 11, § 30.1, *available at* https://www.cms.gov/ Regulations-and-Guidance/Guidance/Manuals/downloads/ clm104c11.pdf.

123.

**(5)    Minimum of 8 hours in 1 day.**  Services must be provided a minimum of 8 hours in a 24-hour period. "The hospice is paid for the hours worked, but a minimum of 8 hours must be provided for the service to qualify as CHC."  Medicare Claims Processing Manual (CMS Pub. 100-02) Ch. 11, § 30.1, *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/ downloads/ clm104c11.pdf.  To be eligible for CHC, the 8 hours must be provided "during a 24-hour day, which begins and ends at midnight. This care need not be continuous, *i.e.*, 4 hours could be provided in the morning and another 4 hours in the evening, but care must reflect the needs of an individual in crisis." *Id.  See also* Medicare Benefit Policy Manual (CMS Pub. 100-02) Ch. 9 § 40.2.1 (Rev. 188, Issued: 05-01-14; Effective: 08-04-14; Implementation: 08-04-14).

124.

**(6)    An RN, LPN or LVN has to provide more than half the care.**

Although some of the CHC care can come from a hospice aide or "homemaker,"

the care "must be predominantly nursing care."  42 C.F.R. § 418.204(a).  As

Medicare puts it: "Nursing care must be provided for more than half of the period

of care and must be provided by either a registered nurse or a licensed practical

nurse."  Medicare Claims Processing Manual (CMS Pub. 100-02) Ch. 11, § 30.1,

*available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/

downloads/clm104c11.pdf.  *See also* Medicare Benefit Policy Manual (CMS Pub.

100-02) Ch. 9 § 40.2.1 (Rev. 188, Issued: 05-01-14; Effective: 08-04-14) ("In

addition to the 8 hour minimum, the services provided must be predominantly

nursing care, provided by either an RN, an LPN, or an LVN").  (NOTE:  Most

states use the term "LPN", or licensed practical nurse.  California and Texas use

the term "LVN", or licensed vocational nurse.)

125.

The rule makes sense since the entire idea behind the care is that the patient

is in a medical crisis that cannot be managed by the patient or his regular

caregivers.  Medicare is plunking down big dollars for continuous care on the

assumption that the patient otherwise would need to be hospitalized because he is

in a temporary medical crisis of such significance that he needs full-time care,

primarily from a trained nurse.

126.

**(7)    The remaining 49% of the care must be provided by a qualified,**

**trained homemaker or hospice aide:**

> The care must be predominantly nursing care provided by either a
> registered nurse (RN) or licensed practical nurse (LPN). In other
> words, at least half of the hours of care are provided by the RN or
> LPN. Homemaker or home health aide (also known as a hospice aide)
> services may be provided to supplement the nursing care.

Medicare Claims Processing Manual (CMS Pub. 100-02) Ch. 11, § 30.1 *available*

*at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/

clm104c11.pdf.

*What is a hospice aide?*

127.

A qualified hospice aide is a person who has successfully completed one of

the following:

**(i)**    A training program and competency evaluation as specified in
paragraphs (b) and (c) of this section respectively.

**(ii)**   A competency evaluation program that meets the requirements
of paragraph (c) of this section.

**(iii)**  A nurse aide training and competency evaluation program
approved by the State as meeting the requirements of § 483.151
through § 483.154 of this chapter, and is currently listed in good
standing on the State nurse aide registry.

**(iv)**   A State licensure program that meets the requirements of
paragraphs (b) and (c) of this section.

42 C.F.R. § 418.76(1).

*What is a homemaker?*

128.

In CMS parlance, a homemaker is an individual specifically trained to meet household needs for a patient in hospice.  A homemaker must either be a hospice aide or "[a]n individual who meets the standards in § 418.202(g) and has successfully completed hospice orientation addressing the needs and concerns of patients and families coping with a terminal illness."  42 C.F.R. § 418.76(j).

129.

Section 418.202(g), the section referred to in § 418.76(j), reads:

> *Home health or hospice aide services furnished by qualified aides as designated in § 418.76 and homemaker services.* Home health aides (also known as hospice aides) may provide personal care services as defined in § 409.45(b) of this chapter. Aides may perform household services to maintain a safe and sanitary environment in areas of the home used by the patient, such as changing bed linens or light cleaning and laundering essential to the comfort and cleanliness of the patient. Aide services must be provided under the general supervision of a registered nurse. Homemaker services may include assistance in maintenance of a safe and healthy environment and services to enable the individual to carry out the treatment plan.

42 C.F.R. § 418.202(g).

130.

**(8)      Activities are related to direct patient care.**  In order to count

toward CHC, the hours have to be spent on "activities related to direct patient

care."  Medicare Benefit Policy Manual (CMS Pub. 100-02), Ch. 9, § 40.2.1 (Rev.

188, Issued: 05-01-14; Effective: 08-04-14; Implementation: 08-04-14).  "Billing

for CHC should not reflect nursing shifts and non-direct patient increments (e.g.,

meal breaks, report, education of staff).  Continuous home care is not intended to

be used as respite care."  Medicare Claims Processing Manual (CMS Pub. 100-02),

Ch. 11, § 30.1, *available at* https://www.cms.gov/Regulations-and-Guidance/

Guidance/Manuals/downloads/ clm104c11.pdf (emphasis in original).  *See also*

MM5245, CMS's MLN Matters, *available at* https://www.cms.gov/ Outreach-and-

Education/Medicare-Learning-Network-MLN/MLNMattersArticles/ downloads/

mm5245.pdf ("[o]nly direct patient care during the period of crisis may be billed . .

.").

131.

**(9)      Documentation supports the care as reasonable and necessary.**

The hospice must "ensure that these direct patient care services are clearly

documented and are reasonable and necessary."  Medicare Benefit Policy Manual

(CMS Pub. 100-02), Ch. 9, § 40.2.1 (Rev. 188, Issued: 05-01-14; Effective: 08-04-

14; Implementation: 08-04-14):

> When a hospice determines that a beneficiary meets the requirements
> for CHC, **appropriate documentation** must be available to support
> the requirement that the services provided were reasonable and
> necessary and were in compliance with an established plan of care in
> order to meet a particular crisis situation. This would include the
> appropriate documentation of the situation and the need for
> continuous care services consistent with the plan of care.

*Id.* "Only direct patient care during the period of crisis may be billed, and

documentation of the crisis and care rendered is to be noted in the Hospice medical

record." MM5245, CMS's MLN Matters, *available at* https://www.cms.gov/

Outreach-and-Education/Medicare-Learning-Network-MLN/MLNMattersArticles/

downloads/ mm5245.pdf.

132.

According to one of Medicare's fiscal intermediaries, in order to justify

continuous care: "The supportive documentation should show clearly the

beneficiary's condition warranting the interventions provided by the hospice staff

at this higher level of care. The documentation should then describe the

beneficiary's response to care." *Continuous Home Care*, CGS (07/25/2012),

*available at* http:// www.cgsmedicare.com/hhh/coverage/coverage_guidelines/

continuous_home_care.html (last visited 10/26/2016).

### 2. *Although It Chose to Disregard Them, Homestead Was Well Aware of the Rules About Continuous Home Care.*

133.

Homestead Hospice is charged with knowing Medicare's rules, and its own documents show that it knew what the rules for Continuous Home Care were, even if it chose not to follow them. In fact, Homestead listed the rules on a laminated card entitled "Homestead Hospice & Palliative Care Levels of Care chart." Homestead explained that continuous home care is a "higher level of care" that should be "[s]hort-term [and] re-assessed at least every 24 hours"; its "[g]oal" is to "[p]rovide short-term crisis management of pain or symptoms during the hospice stay or when the patient is actively dying." *Id.* at 1. On the flip side of the card, Homestead listed the "Criteria for Hospice Inpatient Care and Continuous Care," noting that: "Eligibility for Inpatient or Continuous Care include symptoms that require **acute medical management**." *Id.* at 2. To bill for continuous care, "Hospice must provide licensed nurse 51% of the time, other 49% of time is by other core discipline." *Id.* at 1.

134.

Homestead gave eight examples of the very serious types of situations that would merit continuous care:

1. Uncontrolled Pain
   - Sudden onset or new manifestation of unmanageable pain

- Ongoing pain control/management requiring frequent adjustment in dose or analgesic requiring constant monitoring and evaluation
- Non-verbal signs of pain (groans and grimaces)
2. Intractable nausea, vomiting and diarrhea
3. Respiratory distress
   - Symptoms of rales, rhonchi, wheezing, severe shortness of breath, or ineffective airway clearance
4. Intensive teaching
   - Complicated wound care, dressing changes, medication administration requiring intense interventions
   - Minimum of eight (8) hours of teaching
5. Seizures
   - Requiring intensive intervention, continuous monitoring and medications
6. Psychosocial problems and uncontrolled symptoms which can create significant stress on the patient/family
   - Abrupt change in behavioral or cognitive abnormalities causing severe agitation, disorientation, or combative behavior
   - Severe depression and/or anxiety necessitating a change in environment or safety
   - Suicide ideation, gestures, attempts, threats of euthanasia
   - Acute breakdown or disruption in family dynamics, preventing family members from functioning as adequate caregivers either physically or emotionally
   - Death is imminent with unstable symptoms and caregiver stress
7. Hemorrhage or bleeding
   - Causing symptoms which are difficult for the family to manage
8. Other symptoms
   - Defined by the interdisciplinary team, unmanageable by the family.

*Id.* at 2.

### 3.    *Homestead Overbilled Continuous Care.*

135.

Homestead overbilled CHC, in significant part by providing it to every

patient who left the hospital.

136.

Homestead instructed Mr. Cole and the other marketers to meet with

hospital discharge planners and tell them that Homestead had an extra service that

other hospices did not: "transitional care."  With transitional care, marketers were

supposed to explain, a Homestead representative would meet the patient as he or

she was being discharged from the hospital.  Homestead's representative would

follow the patient back to his home (or assisted living facility or nursing home) and

stay with the patient one-on-one for a minimum of 8 and up to 24 hours.

Homestead promised the one-on-one care before the patient even got to the

hospital, without knowing anything about what the patient's medical situation

would be at the time the patient was released from the hospital – or, for that matter,

whether the patient even would be hospitalized.

137.

Homestead had to come up with a creative way to bill "transitional care",

however, since "transitional care" is not one of the four reimbursable categories of

hospice care.  Homestead decided to bill as if it were providing "continuous care," knowing full well that "transitional care" did not meet the requirements.

### a.    Transitional Care was Given to Every Patient Who Left the Hospital, Regardless of Need.

138.

Homestead drew up a brochure for marketing reps to give to hospitals and skilled nursing facilities (SNF), explaining that transitional care would be provided for **every patient** the hospital or SNF referred to Homestead:

> To ensure a smooth transition, we offer **each patient** leaving the hospital a CNA to assist the patient while the family gets their home ready for their loved one.  The duration of time spent by the CNA in the patient's home is determined by the RNCM who will assess the level of need of both the patient and/or family.

"Butterfly Transition Team" brochure (emphasis added) (Exh. 1).

139.

Homestead does not bother to wait until it can determine whether a patient will need transitional care — in fact, Homestead promises this care even before the patient is hospitalized.  Homestead offers it to every patient, without regard to why the patient was hospitalized or for how long, and without even considering whether the patient actually needs it.  Homestead admits that the care has nothing to do with a crisis situation.  Instead:

> The main focus and goal of our CNA during the transitional care is **to assist the family** as they adjust to their new phase of caring for their loved one. . .  **The first few hours** after being discharged from the

hospital **are the scariest for patients and their families** . . .  We want
to **help our patients remain at home without fear of their new
circumstances**.  We will be there for our patients' support systems to
**teach and guide them on caring for their loved ones**.

*Id.*

140.

At Homestead's Fall Retreat, Homestead provided its employees with a

dinner at an Ellijay restaurant.  At the dinner, owner and operator Mallie

Abdsharafat pushed marketers to use "transitional care" as a marketing tool.  The

company's Marketing Director, M.B., also pressed employees to use transitional

care during Monday morning, company-wide conference calls, which Abdsharafat

attended.

141.

The corporate message was reiterated at the local level.  For example, the

administrators of the Cartersville office, first M.B. and then A.M.#1, repeatedly

reminded Relator Cole and his fellow sales representatives to use transitional care

to bring in more patient referrals for Homestead.

> b.    Homestead Billed "Transitional Care" as Continuous
>        Home Care.

142.

In its brochures and public documents Homestead carefully referred to its

one-on-one medical care program as "transitional care," not "continuous care."

Internally, however, Homestead admitted that "transitional care" was being billed to Medicare as "continuous care."

143.

For example, Homestead's local offices prepared daily census summaries that listed the patients who had been admitted recently, and showed which were receiving continuous care. The mid-July Admit Sheet shows that the Cartersville office had five "continuous care" patients.  For two of the five, the **document actually admits that the patient is merely "transitional from hospital."** 2014/07 Daily Census Summary (redacted; p. 4 of original) (Exh. 2).  Both of those patients were Medicare patients.  *Id.* at 2.

144.

In fact, the document shows that four of the five patients who were on continuous care in the first half of July 2014 were new admits who had been referred by a hospital.  While nationally only 0.8% of hospice patient days are billed as continuous care, 4 of Homestead Cartersville's 19 new admits were on continuous care — 21%.  Ironically, since patients are not eligible for continuous care unless they are in a crisis, patients who have just been released from the hospital are less likely to be in a crisis period; hospitals typically keep patients until they are stable.  Most patients who do need continuous care wind up needing it in the very final days of life, in order to do just what Medicare intended

continuous care to do: allow a dying person to remain at home even as they are in an acute medical crisis.

145.

Additionally, Homestead went to great lengths to touch all the surface elements that might be picked up in a Medicare audit.  For example, Homestead required that its employees stay with the patients for a full 8 hours, which makes sense only if Homestead was trying to qualify for the heftier "continuous care" payment: "[w]hen fewer than 8 hours of care are required, the services are covered as routine home care rather than continuous home care."  Medicare Benefit Policy Manual (CMS Pub. 100-02), Ch. 9, § 40.2.1 (Rev. 188, Issued: 05-01-14; Effective: 08-04-14; Implementation: 08-04-14).

146.

Homestead was adamant about the 8-hour rule, to the point of absurdity.  For example, on one occasion, a patient's caregiver called Mr. Cole to complain that the transitional care nurse was not necessary and in fact was annoying his mother. The patient and her son had asked the nurse to leave, but she was refusing.  Mr. Cole called the Homestead office on the patient's behalf, only to be informed that the nurse could not leave because Homestead personnel had not yet been with the patient a full 8 hours, and the nurse had to be there that long so that Homestead could bill for the time.

147.

Homestead was so determined to have a warm body present with the patient

for a full eight hours that, if CNAs and qualified personnel were not available,

Homestead assigned Mr. Cole and the other sales representatives to stay with the

patients until other (qualified) employees could be available.  Homestead's

overwrought efforts to make sure somebody, anybody, was with the patient for

eight hours only make sense if Homestead was trying to bill the care as

"continuous care."

148.

Furthermore, even though Homestead only promised that a CNA would

provide the transitional care, typically an RN saw the patient for approximately

half the transitional care period — a transparent attempt to comply with the

Medicare rule that: "more than half of the hours of care are provided by an RN,

LPN, or LVN."  Medicare Benefit Policy Manual (CMS Pub. 100-02), Ch. 9, §

40.2.1 (Rev. 188, Issued: 05-01-14; Effective: 08-04-14; Implementation: 08-04-

14).

c.    Examples of Specific Incidents.

**149.**

Patient 1 was being discharged home from the hospital.   As part of the

"transitional care" service, Mr. Cole and RN P.D. met Patient 1's family at North

Georgia Medical Center and then drove together to Patient 1's residence.  Cole and

P.D. stayed until a replacement RN, B.R., arrived.  About an hour after Mr. Cole

and P.D. left, the patient's son called Mr. Cole and asked him to please get Nurse

B.R. to go home.  The son said his mother was fine and "we do not need this nurse

here."  In fact, the son said that the nurse was bothering Patient 1 by staying so

long, and that the nurse was "just sitting here" reading a book.  Relator called

intake coordinator S.C. at the Homestead office and asked that they get B.R. to

leave.  S.C. said she had checked with Administrator A.M.#1, who informed her

that the company could not pull the nurse because Homestead employees needed to

spend a minimum of 8 hours with the patient in the first 24 hours in order for

Homestead to be able to bill Medicare.  Embarrassed, Mr. Cole called Patient 1's

son back and apologized for the inconvenience.

150.

Homestead gave patient Patient 2 transitional care when she was simply

switching from Canton Nursing Home to Sonshine Manor — an extravagant

gesture even by Homestead standards.  Patient 2 was not in a medical crisis of any

sort; in fact, Canton Nursing would not have attempted to transfer Patient 2 if she

had been in a medical 'crisis' that required full-time, continuous nursing care, nor

would Sonshine Manor have accepted Patient 2 had she been in such a precarious

medical situation.  In fact, Patient 2's daughter drove her from Canton to Sonshine,

hardly an indication of a full-blown medical crisis.  Nonetheless, Mr. Cole was told

he needed to sit with Patient 2 personally until the nurse (perhaps S.C.) arrived.

Although Mr. Cole was not certified or qualified to provide continuous care to a

patient, a Homestead employee, possibly S.C., told Mr. Cole that he had to stay

with the patient because someone had to be present for 8 hours so that Homestead

could bill Medicare.

151.

On more than one occasion, Homestead billed Mr. Cole as if he were an

actual, trained aide.  For example, he was sent to sit with a patient who was being

discharged from Piedmont Mountainside Hospital.  Mr. Cole sat with the patient

while they waited for A.M.#2, a Homestead RN, to arrive.  Mr. Cole was told that

he had to be present because Homestead needed to accrue a minimum of 8 hours in

this 24-hour period in order to bill Medicare.  When Nurse A.M.#2 arrived, she

said she was not able to stay the full amount of time and began trying to arrange

for another Homestead representative to cover the remaining hours that were

necessary for Homestead to bill Medicare.

152.

The mid-July 2014 admit sheet for Homestead Cartersville openly admits

that two of the five patients who received continuous care in the first half of the

month were receiving continuous care *because* they were transitional from the

hospital.  2014/07 Homestead Cartersville Daily Census Summary (redacted; p. 4 of original) (Exh. 2).  Of the five patients who received continuous care, only 1 has a potentially legitimate, if vague, reason — "symptom management" — listed.

153.

While Relator Cole was working at a different hospice, the hospice treated a dying patient at Phoenix Nursing Home of Dunwoody.  The Phoenix staff asked Mr. Cole's new hospice to put the patient on continuous care, but the hospice repeatedly assessed the patient and determined that she did not meet Medicare's stringent requirements for continuous care.  Phoenix fired the hospice and moved the patient to Homestead Hospice, because, they explained, Homestead was willing to put the patient on continuous care.

154.

Based on the facts cited herein, Homestead Hospice billed Medicare for Continuous Care for patients, including the above-listed patients, who were not in a medical crisis but who were simply transitioning home from the hospital.

**B.** **Homestead Violated the Anti-Kickback Statute.**

**155.**

Even if transitional care had never been billed to Medicare, Homestead used it as a centerpiece of a comprehensive kickback scheme, in direct violation of the AKS.  The AKS makes it abundantly clear that medical providers cannot use

kickbacks as a marketing tool.  Furthermore, Medicare warned hospices that they

need to set up policies and procedures and train employees in order to avoid

violating the AKS.

156.

Unbeknownst to Medicare, Homestead did the opposite; it built its entire

marketing program around kickbacks ranging from "transitional care" to a free

Arts program.  Homestead offers an array of kickbacks to hospitals, nursing homes

and living facilities, including:

> *       "Transitional care";
> *        Free CNAs;
> *       Nurturing Arts programs;
> *       Special events for residents and staff;
> *       Gifts and lunches for residents and staff;
> *       Inservice programs for facility staff members;
> *       Free social services programs for residents and staff;
> *       Publication of free promotional articles.

Each of these kickbacks, individually, violates the AKS; collectively, they created

a nightmare scenario for Homestead's competitors as well as Medicare, violated

the AKS, and were material to Medicare.

157.

Homestead also offers the kickbacks to facilities that are not bearing

substantial financial risk for the cost of the medical care to the patients, which is

being passed through to Medicare, or that are not medical centers and do not

provide medical care at all.

### 1.    Homestead Did Not Institute Policies to Avoid Kickbacks and It Did Not Train Employees About the AKS.

158.

As far back as 1999, OIG told hospices that they needed to institute policies aimed at preventing violations of the AKS.  Furthermore, OIG warned hospices that they needed to train employees on how to avoid violations of the hospice regulations and the AKS.  In the name of profit, Homestead did neither.

### a.    Homestead Did Not Institute Policies and Procedures to Avoid Violating the AKS.

159.

Hospices "should have policies and procedures in place with respect to compliance with Federal and State anti-kickback statutes and other applicable laws."  OIG Compliance Program Guidance for Hospices (Oct. 1999), *available at* http://oig.hhs.gov/authorities/docs/hospicx.pdf.  Specifically, those policies need to ensure that the hospice does not:

> • "Submit . . . claims for patients who were referred to the hospice pursuant to contracts or financial arrangements that were designed to induce such referrals in violation of the anti-kickback statute or similar Federal or State statute or regulation;" or

> • "[O]ffer or provide gifts, free services, or other incentives to patients, relatives of patients, physicians, nursing facilities, hospitals, contractors or other potential referral sources for the purpose of inducing referrals in violation of the anti-kickback statute or similar Federal or State statute or regulation."

*Id.*

*160.*

OIG noted that hospices "are particularly vulnerable to fraud and abuse"

when they are dealing with entities such as nursing homes, so the hospice had

better "set sufficient oversight controls in place to ensure that care it provides to

nursing home residents is appropriate, complete, and in accordance with applicable

laws and Federal health care program requirements" (OIG Compliance Program

Guidance for Hospices (Oct. 1999), *available at* http://oig.hhs.gov/authorities/

docs/hospicx.pdf):

> In particular, arrangements between nursing homes and hospices are
> vulnerable to fraud and abuse because nursing home operators have
> control over the specific hospice or hospices they will permit to
> provide hospice services to their residents. Moreover, hospice patients
> residing in nursing homes may be particularly desirable from a
> hospice's financial standpoint. Therefore, with respect to
> arrangements with nursing homes, a hospice should develop policies
> and procedures to prevent the following practices from occurring,
> which may constitute potential kickbacks:
>
> > • Hospice offering free or below fair market value goods
> > to induce a nursing home to refer patients to the hospice;
> >
> > *    *    *
> >
> > • Hospice providing free (or below fair market value)
> > care to nursing home patients, for whom the nursing
> > home is receiving Medicare payment under the Medicare
> > Skilled Nursing Facility Benefit, with the expectation
> > that after the patient exhausts the skilled nursing facility
> > benefit, the patient will receive hospice services from that
> > hospice; and
> > • Hospice providing staff at its expense to the nursing
> > home to perform duties that otherwise would be
> > performed by the nursing home.

*Guidance for Hospices*, OIG Compliance Program, 64 Fed. Reg. 54040  (Oct. 5,

1999), *available at* http://oig.hhs.gov/authorities/docs/hospicx.pdf.  Hospices face

the same inherent risks when they offer free goods, care and staff to assisted living

facilities.

161.

Instead of setting up policies that would prevent kickbacks, Homestead set

up a marketing program that exploited the very dangers that Medicare had warned

about.

b.    Homestead Did Not Teach Employees About the
Regulations Related to Kickbacks.

1.

Medicare also warned hospices that they needed to teach employees about

Medicare's regulations and about the AKS rules:

> [C]ompliance programs for hospices should still address areas of OIG
> concern that include:
>
> -    Admitting patients to hospice care who are not terminally ill;
>
> -    Hospice incentives to actual or potential referral sources (*e.g.*,
>      physicians, nursing homes, hospitals, patients, etc.) that may
>      violate the anti-kickback statute or other similar Federal or
>      State statute or regulation, including improper arrangements
>      with nursing homes;
>
> -    Billing for a higher level of care than was necessary;
>
> -    Billing for hospice care provided by unqualified or unlicensed
>      clinical personnel . . .

OIG Compliance Program Guidance for Hospices (Oct. 1999), *available at* http://oig.hhs.gov/authorities/docs/hospicx.pdf.

162.

Despite the numerous warnings from OIG, as well as the detailed description of the training hospices needed to provide to employees, Homestead did not provide its employees with any sort of training about the limitations on gifts and relationships, or about the Anti-Kickback Statute in general.

163.

In fact, much to the contrary, Homestead told Mr. Cole and its other sales representatives that they were "not supposed to say no." If the sales reps felt that a request was unreasonable, they were supposed to demur and contact Homestead's administrator, who would decide whether the request should be granted. Mr. Cole did not learn about the limits Medicare set on gift-giving until after he left Homestead and went to work for another hospice provider.

164.

Because it never told its employees that hospices were supposed to avoid kickbacks, Homestead was able to implement a marketing system that was based on illegal gifts and kickbacks.

## 2. *Homestead's "Transitional Care" Program Was an Illegal Kickback.*

165.

Homestead's "transitional care" program violated the False Claims Act in two ways.  First, as detailed above, each time a patient left the hospital, Homestead provided 8 hours of one-on-one care, and billed it to Medicare as pricey "continuous care."  Homestead offered this care regardless of whether a patient needed it and without even bothering to assess whether the patient's needs met the strict criteria Medicare has set out for "continuous care."  By billing unnecessary, unapproved care, Homestead made false claims against the Government.

166.

The transitional care program **also** violated the False Claims Act in a **second, independent** way.  Even if every patient had actually needed and been authorized to receive continuous care, and even if Homestead had never billed Medicare for the generous, eight hours of personal, one-on-one care, Homestead's "transitional care" program **still** violated the Anti-Kickback Statute because Homestead used it as "something of value" in order to get new patients.  For that reason alone — separate and apart from the question of how the "transitional care" services were billed and whether they were needed — Homestead is liable under the False Claims Act because it used transitional care as a kickback.

a.    The Transitional Care Was a Kickback of Value to the Potential Referral Sources Hospices Traditionally Try to Reach.

167.

Billed as continuous care, Medicare pays $944.79 a day to get the sort of intense, one-on-one care that Homestead offered for free (to the patient, not to Medicare) every time a patient left the hospital.  For obvious reasons, all of Homestead's potential referral sources were interested in getting such a valuable service for free.  The facilities where the patients lived were delighted to take the burden of caring for the patients off their own staffs, which was "of value" to them. Patients were pleased at the prospect of free, one-on-one care, a clearly valuable service.  And hospitals were especially enthusiastic about the program because Homestead explained how it could save the hospitals millions of dollars.

b.    "Transitional Care" Was a Centerpiece of Homestead's Marketing Plan.

168.

Homestead held weekly meetings on Mondays, and in the meetings Homestead repeatedly told its sales representatives that they should use "transitional care" as a way to convince referral sources to send business to Homestead.  To help the sales representatives get the message out, Homestead drew up a pamphlet to tout its transitional care program.

169.

The brochure made it clear that transitional care was available for "**each patient** leaving the hospital."  "Butterfly Transition Team" brochure (Exh. 1) (emphasis added).  In fact, it entitled an entire section of the brochure: "**No Discharge Left Alone**."  *Id.*

> c.    Homestead Tells Hospitals that "Transitional Care"
>        Could Save the Hospitals Large Sums of Money.

170.

When it markets "transitional care" to hospitals, Homestead points to a Medicare regulation that went into effect on October 1, 2012.  Under the regulation, if a certain number of a hospital's patients are discharged and then boomerang back into the hospital within thirty days, Medicare reduces the amount it pays the hospital — across *all* of the hospital's Medicare patients, not simply the ones who bounced back into the hospital.

171.

Homestead tells hospitals that Homestead's free "transitional care" program will help hospitals avoid the readmission penalty – provided they simply refer their patients to Homestead.  In fact, Homestead devoted a section of its brochure to this very argument:

> The first few hours after being discharged from the hospital are the scariest for patients and their families.  **That is when a revisit to the hospital is most likely to occur.**  We want to help our patients remain at home without fear of their new circumstances.  We will be there for

our patients' support systems to teach and guide them on caring for
their loved ones.

"Butterfly Transition Team" brochure (Exh. 1) (emphasis added).

### i.    Readmission Penalties.

172.

To make sure that hospitals do not abuse the Medicare system, Medicare
caps how much it will pay for some types of medical treatment. Since the hospital
starts to lose money when it exceeds the cap, the hospital has no incentive to
needlessly extend a patient's hospital stay or to over-treat the patient.

173.

On the other hand, once the hospital hits the cap, it has an incentive to
*discharge* the patient even if he has not been fully treated. Also, the hospital might
be tempted to engineer a "break" in the treatment that would allow it to start over
on the cap.

174.

Readmissions are taxing on patients and expensive for Medicare. With
urging from Congress, CMS has enacted two major provisions aimed at reducing
readmissions and their increased costs. These provisions shift a portion of the cost
of a readmission onto the hospital, instead of leaving CMS and the patient to bear
all of the burden.

> (A)    *Medicare Will Not Pay Hospitals that Discharge Patients Who Boomerang Back into the System for the Same Reason Within 24 Hours.*

175.

To align the hospital's incentives with the best interests of the patient and Medicare, Medicare made a rule that if a patient is released from the hospital but then pops back into the hospital for the same condition within 24 hours, Medicare will not start a new cap for the second hospital stay.  Medicare reasons that the second hospital admission is really just an extension of the first one:

> When a patient is discharged/transferred from an acute care Prospective Payment System (PPS) hospital, and is readmitted to the same acute care PPS hospital on the same day for symptoms related to, or for evaluation and management of, the prior stay's medical condition, hospitals shall adjust the original claim generated by the original stay by combining the original and subsequent stay onto a single claim.

Medicare Claims Processing Manual, Chapter 3, Section 40.2.5 (Repeat Admissions), *available at* https://www.cms.gov/Regulations-and-Guidance/ Guidance/Transmittals/downloads/R266CP.pdf.

176.

Furthermore, "[s]ervices rendered by other entities during a combined stay must be paid by the acute care PPS hospital. The acute care PPS hospital is responsible for the other entity's services per common Medicare practice." *Id.  See also Revision of Common Working File (CWF) Editing for Same-Day, Same-*

*Provider Acute Care Readmissions*, MLN Matters (2004), *available at*

https://www.cms.gov/Outreach-and-Education/ Medicare-Learning-Network-

MLN/MLNMattersArticles/ downloads/MM3389.pdf ("Please be aware that

services rendered by other institutional providers during a combined stay must be

paid by the acute care PPS hospital as per common Medicare practice.")

177.

Medicare recognizes that an unscrupulous hospital could code the second

admission as something "different" and then apply for a new cap.  Medicare warns

hospitals that it will be on the prowl to stop that sort of behavior:

> When a patient is discharged/transferred from an acute care PPS
> hospital and is readmitted to the same acute care PPS hospital on the
> same day for symptoms unrelated to, and/or not for evaluation and
> management of, the prior stay's medical condition, hospitals will
> place condition code (CC) B4 on the readmitting claim for the
> subsequent readmission. Please be aware that upon request of the
> Quality Improvement Organization (QIO), hospitals will be required
> to submit medical records pertaining to the readmission.

*Revision of Common Working File (CWF) Editing for Same-Day, Same-Provider*

*Acute Care Readmissions*, MLN Matters (2004), *available at*

https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-

MLN/MLNMattersArticles/ downloads/MM3389.pdf.

(B)    *Medicare Docks a Hospital's*
       *Reimbursement Across All Medicare*
       *Patients if Excessive Numbers of Patients*
       *are Readmitted Within 30 Days.*

178.

The Affordable Care Act of 2010 required Health and Human Services to set

up a "readmission reduction program" to "provide incentives for hospitals to

implement strategies to reduce the number of costly and unnecessary hospital

readmissions." *Medicare's Hospital Readmission Reduction Program FAQ*,

American College of Emergency Physicians (5/6/2015), *available at*

http://www.acep.org/ Physician-Resources/Practice-Resources/Administration/

Financial-Issues-/-Reimbursement/Medicare-s-Hospital-Readmission-Reduction-

Program-FAQ/.  To comply with the Act, Medicare added additional regulations

designed to address readmissions for patients who remain out of the hospital for

more than 24 hours, but nonetheless are back within 30 days.

179.

HHS implemented its new rules, called the Hospital Readmission Reduction

Program ("HRRP"), beginning on October 1, 2012, for fiscal year 2013.  At the

time, 20% of Medicare patients were being re-admitted to the hospital within 30

days of discharge.  Medicare told hospitals that they needed to improve this

average, and each year it sets the bar a little higher.  Under HRRP, hospitals that

fail to do better have their **Medicare reimbursement rates reduced across the**

**board <u>for all patients,</u> not just the ones who were readmitted.** *See* 42 C.F.R. § 412.154(b).

180.

The HRRP program began by focusing on readmissions after three, particular types of hospital stays: heart attack, heart failure, and pneumonia.  For fiscal year 2015, Medicare expanded the program to include readmissions for chronic obstructive pulmonary disease (COPD), and elective hip or knee replacement.  In 2017, the program will cover coronary artery bypass graft (CABG) admissions.  Medicare tracks <u>all</u> types of readmissions because it intends to expand the program to cover other types of readmissions in the future.

181.

In 2013, HRRP cost hospitals an average of .27% of *all* of their Medicare reimbursements; by fiscal year 2015, the figure rose to .49%.  *See* Cristina Boccuti and Giselle Casillas, *Aiming for Fewer Hospital U-Turns: The Medicare Hospital Readmission Reduction Program*, The Henry J. Kaiser Family Foundation (Jan. 29, 2015), *available at* http://kff.org/medicare/issue-brief/aiming-for-fewer-hospital-u-turns-the-medicare-hospital-readmission-reduction-program.

182.

The result?  HRRP has created a serious dent in the bottom line for most hospitals.  "CMS estimated total hospital penalties under the HRRP to sum to $428

79

million in 2015, an increase over prior years ($290 million in 2013 and $227 million in 2014)." *Id.* In 2013, 64% of hospitals received a penalty, and the figure rose to a whopping 78% of all hospitals by fiscal year 2015. *Id.*

### ii. Homestead Promoted "Transitional Care" as A Way Hospitals Could Avoid Costly Readmissions.

183.

Homestead told its marketers to meet with the discharge planners at hospitals and tell them about how transitional care could help the hospitals avoid losing money under Medicare's "new rule." According to Homestead's talking points, the first 24 hours after a patient is discharged are the most critical in determining whether the patient will be re-admitted. The patient and caregiver are nervous and not yet accustomed to the follow-up care, and they do not yet have a firm grasp on how to deal with any new problems, equipment, etc. As a result, patients and their families are more likely to panic and head right back into the hospital.

184.

Each time the hospital referred a patient to Homestead, the marketers explained, two Homestead employees — the sales representative and a CNA — would meet the patient at the hospital and then follow the patient back to his house or residential facility. Homestead's employees would deal with the durable

medical equipment needs and then sit with the patient and calm the patient and his caregivers. Every hospital patient referred to Homestead, the marketers were told to explain, would get at least 8 and probably 24 hours of continuous care, and neither the hospital nor the patient would be charged. The intense, one-on-one care could help hospitals decrease those costly readmissions.

185.

If the discharge planners did not "get it," Homestead told its marketers to work their way up the hospital chain of command all the way to the CFO to get the hospital to understand how Homestead's transitional care could help the hospital's bottom line. Homestead armed its sales reps with the transitional care brochure as well as copies of an article about how readmissions lowered hospital reimbursement rates across all Medicare patients.

186.

As instructed, Mr. Cole and the other sales representatives fanned out to tell hospitals and nursing homes, "we will fight to keep the patient at the house." Most discharge planners and CFOs told Mr. Cole that they had never heard of transitional hospice care (an unsurprising reaction given that "transitional care" was not a category of hospice care), but they were enthusiastic about the new program and they began to refer patients to Homestead in order to get it.

187.

"Transitional care" has become a centerpiece of Homestead's already kickback-heavy marketing efforts.  Homestead offers it as a valuable "remuneration" in order to induce hospitals to refer their patients to Homestead for government-funded hospice services.

### 3.    *Homestead Offered a Host of Additional Kickbacks.*

188.

"Transitional care" may be the most expensive kickback Homestead offers, but it is by no means the only one.  In fact, Homestead grounds its marketing plan on an assortment of kickbacks ranging from free medical care to casino nights to Longhorn Steakhouse lunches.  The kickbacks vary in size and type, but they have one thing in common: they are offered for free in order to generate or reward referrals of government-funded healthcare business to Homestead.

### a.    Free CNAs.

189.

OIG has repeatedly warned hospices that they cannot provide staff to nursing homes.  Ignoring the warning, Homestead provides free CNAs to personal care homes and assisted living facilities that refer patients to Homestead.

### i.    Medicare Has Said Repeatedly that Providing Employees is a Kickback.

190.

Medicare has been chasing the "free employee" fraud since at least 1995,

when it issued a Special Fraud Alert about kickbacks in the home health industry:

> Kickbacks have taken the following forms: . . .
> Providing hospitals with discharge planners, home care coordinators,
> or home care liaisons in order to induce referrals. . . .
> Providing free services, such as 24 hour nursing coverage, to
> retirement homes or adult congregate living facilities in return for
> home health referrals.

*OIG Special Fraud Alert: Home Health Fraud, and Fraud and Abuse in the*

*Provision of Medical Supplies to Nursing Facilities*, 60 Fed. Reg. 40847-40851,

no. 154 (Aug. 10, 1995), *available at* https://oig.hhs.gov/fraud/docs/

alertsandbulletins/081095.html.

191.

In 1998, OIG issued another Special Fraud Alert, this one aimed directly at

the hospice industry:

> Specific practices which are suspected kickbacks include: . . .
> *        A hospice providing free (or below fair market value) care to
> nursing home patients, for whom the nursing home is receiving
> Medicare payment under the skilled nursing facility benefit, with the
> expectation that after the patient exhausts the skilled nursing facility
> benefit, the patient will receive hospice services from that hospice.
> *        A hospice providing staff at its expense to the nursing home to
> perform duties that otherwise would be performed by the nursing
> home.

Fraud and Abuse in Nursing Home Arrangements with Hospices, OIG Special

Fraud Alert (Mar. 1998), *available at* http://oig.hhs.gov/fraud/docs/alertsand

bulletins/hospice.pdf.

192.

In 1999, OIG reiterated that: "[e]xamples of arrangements that may run

afoul of the anti-kickback statute include practices in which a hospice . . . provides

nursing, administrative, and other services for free or below fair market value to

physicians, nursing homes, hospitals and other potential referral sources with the

intent to influence referrals." OIG Compliance Program Guidance for Hospices, 64

C.F.R. 192 at 54035, n.29 (Oct. 1999), *available at* http://oig.hhs.gov/authorities/

docs/hospicx.pdf.  OIG prepared a guidance to help hospices write their

compliance programs, and suggested that hospices: "develop policies and

procedures to prevent [those] practices from occurring, which may constitute

potential kickbacks." *Id.* at 54040.

193.

The industry is well aware that OIG considers providing employees to be

fraud:

> If you provide staff for free or below fair market value to a referral
> source to perform the duties normally performed by the referral
> source's staff, you are providing them with something of value – staff.
> If even one reason for providing this staff is to induce referrals, you
> are in violation of the Anti-Kickback statute. In addition to

condemning this practice in fraud bulletins, OIG has issued a number of advisory opinions reiterating this position…

Robert W. Markette, Jr., *Home Health and Hospice Marketing: Some Common Practices That Shouldn't Be So Common*, Indiana Association for Home & Hospice Care, Inc. (Jan. 2007).

> ii. **Ignoring the Rule, Homestead Inserts CNAs into Personal Care Homes and Assisted Living Facilities.**

194.

In blatant disregard of OIG's repeated warnings, Homestead places its CNAs in personal care homes and assisted living facilities. These CNAs care for all of the patients in the facility, not just the ones who are patients of Homestead Hospice. In fact, on several occasions when Relator Cole visited a facility, the Homestead CNA was the only aide on duty in the entire facility.

195.

For example, Homestead provided free CNA's to the following assisted living facilities and personal care homes:

196.

**<u>Sonshine Manor Personal Care</u>** is a retirement and assisted living facility in Jasper, Georgia. The home, which is located at 115 Stephens View Rd., Jasper, Georgia, 30143, has 11 beds. Many of Sonshine's residents are relatively healthy; not every resident needs hospice.

197.

To generate referrals from Sonshine, Homestead placed two, full-time CNAs in the home.  As Relator Cole personally witnessed, these CNAs — L.R., A.C. and later, J.J. — cared for all of the residents at Sonshine Manor, not just the ones who were Homestead patients.  The Homestead CNAs were sometimes the only providers working a given shift at the home.

198.

These CNAs are paid by Homestead and are Homestead employees.  They even wear scrubs that say "Homestead" on the front.

199.

Not surprisingly, Sonshine Manor refers all of its residents to Homestead when they need hospice.  Relator Cole marketed successfully to Sonshine Manor while he worked at Homestead, but when he began marketing for a new hospice company, Sonshine's director would not consider switching to Mr. Cole's new hospice; she told him that the home only referred its residents to Homestead.

200.

**Woodland Ridge Assisted Living.**  Homestead has a similar arrangement with Woodland Ridge Assisted Living, located at 4005 S. Cobb Dr., Smyrna, GA 30080.  Homestead has placed two full-time CNAs at the assisted living facility, and the CNAs give care to patients who are not receiving hospice from Homestead.

201.

**Douglas Personal Care Home & Rehab.**  Homestead employed two CNAs who were placed full time at Douglas Personal Care Home & Rehab.  As at Sonshine Manor and Woodland Ridge, these CNAs care for patients regardless of whether they are patients of Homestead Hospice.

202.

**Roman Court Assisted Living.**  Homestead hired P.G., the wife of the administrator of Roman Court Assisted Living, to be a marketer for Homestead.  At her request, Homestead placed two CNAs at Roman Court, now Winthrop Court Senior Living Community, at 1168 Chulio Rd., Rome, Georgia 30161.  These CNAs also care for residents who are not Homestead patients and are not on hospice.

203.

**Gracemont Senior Living.**  Homestead hired two CNAs and sent them to work at Gracemont, a senior living facility in Cumming, Georgia.  Although only seven of Gracemont's residents were Homestead patients at the time, the CNAs cared for Homestead and non-Homestead patients alike.

204.

For obvious reasons, the assisted living facilities are quite enthusiastic about receiving free staff members.

205.

In each of these cases, Homestead placed the CNA at the living facility in order to induce or reward patient referrals or the generation of hospice business payable by government-funded health care programs.

### b.      Nurturing Arts Program.

206.

Homestead offers an extensive "Nurturing Arts" program to facilities that either do or might refer business.   Homestead features the program in all of its brochures and pamphlets, and Homestead sales representatives pass out "Nurturing Activities Sign Up" sheets to personal care homes and assisted living facilities (Exh. 5).  The sheets let the facilities select the day of the week and time that Homestead will come to offer a free arts program to the facility's residents.  "We offer Personal Care Homes 1 session per month and Assisted Living Facilities weekly sessions," the sheet says.  Facilities can choose between four types of art sessions: "Art (full arts and crafts)"; "Music (interactive performance)"; "Dance (interactive performance)"; "Massage (caregiver workshop)"; and "All of the above (we will choose for you and mix it up)." *Id.*

### i.    The Performances Were of Value to Homestead's Referral Sources.

207.

Homestead hired a Director of Nurturing Arts, L.C.; later, L.T. was hired for the post. L.C. and L.T. retained a small army of performers, including actors, musicians, magicians, tai chi artists, and belly dancers, to give performances at facilities that do or might refer business to Homestead. The performances are not connected to any particular medical or emotional need of Homestead's patients; they are part of a menu of programs from which the facility can choose and they are open to all residents of facilities that might or do refer patients on a regular basis. In fact, since the entertainers are independent contractors, they have no idea which members of the audience are Homestead patients, and no one takes attendance to determine whether any Homestead patient actually attends the performance.

208.

Homestead offers the Nurturing Arts program for free to the living facilities and their residents, but the programs cost substantial amounts on the open market. On GigMasters.com, belly dancers available to perform in the Cartersville area charge $200 - $1500 per performance; magicians advertise performances for $125 - $1000 per event; jazz groups playing music from the swing era charge $375 to

$3800 for a performance; tai chi classes are offered for $25 per person for a single

class; and massage classes for caregivers are offered at $10 per participant.

209.

Homestead has expanded the program to the point where it is now hiring

performers directly and producing its own shows.  In Spring 2016, the hospice

advertised on indeed.com for professional "Actors, Dancers and Singers for their

upcoming productions."  According to Homestead's advertisements, the jobs pay

$60 an hour.  One of the productions was an original play, "Mallie the Butterfly,"

named after Defendant Sharafat.  An original play entitled "The One Wing

Butterfly" premiered at Egleston Children's Hospital.  On June 1, 2016,

Homestead put on a "murder mystery theater event" at Sunrise in Buckhead.

210.

One of Homestead's artists posted this message on the Homestead Facebook

page:

> I work as a nurturing artist with Homestead Hospice in Blairsville, GA.  I
> did a Halloween musical show at Branan Lodge senior apartments in
> Blairsville on Monday, October 31. . .  It is my pleasure to be working with
> Homestead Hospice providing a fun music show **on a monthly basis to the
> facilities I visit**.

Facebook post (11/6/2016) (emphasis added).

211.

Since Homestead offers its nurturing arts classes monthly in smaller facilities and weekly in larger ones, the value totes up to thousands of dollars a year.  Assuming a very conservative cost of $200 per performance, Homestead is giving larger facilities some $10,400 worth of free performances a year, and smaller facilities are receiving at least $2400 in performances.

212.

Additionally, since Homestead both plans and pays for the shows and classes, the Nurturing Arts program takes the burden off the activities directors and staff members at the facilities and frees up their budget dollars, which can then be devoted to the facilities' other programs and priorities.

> **ii.    Homestead Offers the Nurturing Arts Program to Any Facility that Can Refer Business, But Pulls the Program if the Facility Does Not Send Business to Homestead.**

213.

Homestead offers its Nurturing Arts program to all "active accounts," and told Relator Cole that an "active account" was "any place that is in your territory." The programs are available to facilities that have Homestead patients and also to facilities that don't have Homestead patients but might be willing to refer patients in the future, including:

* Cameron Hall in Canton, Georgia (now owned by Five Star Senior Living);
* Cameron Hall in Ellijay, Georgia;

    \*      Serenity Mountain Manor in Jasper, Georgia;

    \*      Rock Creek Manor in Jasper, Georgia; and

    \*      Roman Court in Rome, Georgia (now Winthrop Court Senior Living Community).

214.

Homestead is offering the Nurturing Arts program in order to induce or reward patient referrals and the generation of hospice business payable by government-funded health care programs. If the program does not work — meaning the facility does not in fact drum up any referrals for Homestead — Homestead pulls its Nurturing Arts program. For example, Mr. Cole was marketing to Cameron Hall in Ellijay, Cameron Hall in Canton, and Serenity in the Mountains, but the three facilities went six months without referring a patient to Homestead. Homestead Administrator A.M.#1 instructed Mr. Cole to tell the director of each facility that Homestead would pull its Nurturing Arts program if Homestead did not get a patient referral from the facility.

215.

The director of Serenity in the Mountains, V.S., had really liked the Nurturing Arts program and was upset to lose it. She protested that Serenity simply had not had an appropriate patient it could refer, but Homestead pulled the program, anyway.

c.    Homestead Offers Free Events to Generate Referrals.

216.

In addition to the Nurturing Arts program, Homestead provides a variety of activities to residents at facilities that are referring or may refer patients for hospice care.

**i.    Events Offered.**

217.

In the Communication Binder that it leaves at every referring facility, Homestead tells the facility that: "Hospice will provide and participate in social activities in the facility."  Communication Binder at 13.  The facility can select from a variety of "facilities activities programs":

> The following activities are offered by Homestead Hospice & Palliative Care to assist you in providing recreational outlets for your staff, residents and families. Contact your Community Relations Manager or call us today to schedule the following activities in your facility.
>
> •    Butterfly Painting
> •    Taste of Homestead
> •    Bingo
> •    Ice Cream Social
> •    Music Therapy
> •    Pet Therapy
> •    Massage Therapy
> •    Art Therapy
> •    Special Occasion Events
> •    Mardi Gras
> •    Holiday Events
> •    Cookouts

- Casino Nights
- Family Night Presentations

Assisted Living Facility Collaboration Program at 9 (brochure p. 6) (Exh. 3);

Skilled Nursing Facility Collaboration Program at 9 (brochure p. 6) (Exh. 4).

218.

Homestead tells facilities that the list is only the beginning of the activities

Homestead is willing to provide — **if** the facility refers business to Homestead:

> Our Community Relations Managers partner **with active accounts** to provide activities by request. If there is an activity you would like us to participate in that is not listed, please contact your Community Relations Manager or call our office today 877.355.HHPC (4472).

Assisted Living Facility Collaboration Program at 10 (brochure p. 7) (Exh. 3);

Skilled Nursing Facility Collaboration Program at 10 (brochure p. 7) (Exh. 4)

(emphasis added).

## ii.    Types of Events Offered.

219.

Homestead urges its marketing employees to organize a variety of events,

including the types listed in the following paragraphs.

220.

When Sonshine Manor opened a new Dahlonega location, Homestead

sponsored a Fall Festival featuring a petting zoo, cotton candy, funnel cakes, a

"balloon pop," and even the opportunity to "win a goldfish."

221.

The petting zoo alone was a sizable remuneration.  The website for a North Georgia company says it charges $270 to provide a petting zoo for an hour; the price zooms to $585 if the zoo includes ponies.  *See* Cricket's Mobile Petting Zoo, *available at* http://www.minizooparty.com/rates.

222.

Homestead purchased gaming tables and materials so that it can offer "Casino Nights" to its referral partners.  For example, while Mr. Cole was at Homestead, Homestead put on a Casino Night at Roman Court.

223.

On August 18, 2014, the Cartersville Office put on a Casino Night at Wellington Place Assisted Living in Kennesaw.

224.

Homestead put on a Casino Night at Sandy Plains Assisted Living in Marietta on April 17, 2015.  The event involved "food, fun and games."

225.

On November 10, 2015, Homestead co-sponsored a Casino Night for the Alzheimer's Association at Delmar Gardens in Smyrna.

226.

According to 5corporateeventchannel.com, casino parties run $150 - $500 per table.  Homestead offered some 7 to 9 tables or games, including black jack, poker, and a roulette wheel.

227.

Each holiday season, Homestead throws a huge party and invites business contacts and referral sources.  Homestead has food catered in and shuttles guests in by limo.  Hundreds of guests attend the soiree, and Mr. Cole was told that the annual event costs $150,000.

228.

Homestead marketers regularly organized ice cream socials for new residents at facilities that could or did give Homestead business.  For example, on numerous occasions Mr. Cole organized ice cream socials, sponsored and paid for by Homestead, for new residents coming in to Cameron Hall.  Mr. Cole estimates that he typically spent $35 on an ice cream social.

229.

Homestead continues to offer these sorts of parties; Homestead's Facebook page boasted about a "root beer floats" party at 5th Avenue Nursing and Rehab in Rome, Georgia.

230.

In February 2014, Mr. Cole organized a Valentine's party and a lunch at Sonshine Manor, and also purchased gifts and prizes for staff and residents of Sonshine and other facilities, as well as for physicians.  Homestead paid for all of these expenses.

231.

In May, Homestead paid Mr. Cole to host a Cinco de Mayo party at Cameron Hall Canton, a luncheon at a steakhouse for 17 staff members of Georgia Cancer Blue Ridge, a Chick-fil-A lunch catered in for staff members at Georgia Cancer Jasper, and prizes for a raffle at Benton House Woodstock.

232.

Homestead continues to offer an array of social activities to the facilities that refer it business.  "Activities to engage and entertain are one of our main focuses," Homestead proclaimed on its Facebook page in a February 26, 2016 post. Homestead hired belly dancers to perform at Lazy R and Cameron Hall of Ellijay. That month Homestead also boasted on its Facebook page about activities such as providing food for a fashion show at Atria Senior Living and providing musical entertainment at Providence Personal Care Home in Milton/Alpharetta, Georgia.

233.

On October 21, 2016, Homestead's Athens office provided a fall festival at Nancy Hart Nursing Center in Elberton, Elbert County, Georgia, and made autumn wreaths with patients at a nursing facility (not named in Homestead's Facebook post), also in Elberton.

234.

On January 29, 2016, Homestead "collaborated" with Phoenix Nursing Home of Dunwoody to put on a "delizioso Italian night for residents to enjoy replete with a wine tasting."

235.

On April 13, 2015, the Athens office put on a spring event at Heardmont, making "lady bug bucket crafts" that were filled with candy.

236.

Homestead also convinced volunteers to provide valuable, free services in Homestead's name, which Homestead then used to generate new business referrals. For example:

237.

On March 30, 2015, Homestead posted about "Our Athens Office Hairdresser", a Homestead volunteer who cuts patients' hair for free at Morningside Assisted Living Facility.

238.

On March 23, 2015, Homestead's Athens office used volunteers from a local sorority to give massages and manicures to the women at Oxton Place Assisted Living in Gainesville.

239.

The following is a very small selection of the events Homestead features on its Facebook page:

| Event | Location |
|---|---|
| BBQ for CNAs | Belmont Village in Johns Creek, GA |
| Beauty Pageant | Woodhaven Manor Nursing Home in Demopolis, AL |
| Beauty Pageant Hotel | Woodhaven Manor Nursing Home in Demopolis, AL |
| Belly Dancer | Lazy R Assisted Living in Blairsville, GA |
| Belly Dancer | Cameron Hall in Ellijay, GA |
| Casino Night Alzheimer's Association | Delmar Gardens in Smyrna, GA |
| Casino Night | Heritage of Sandy Plains in Marietta, GA |
| Casino Night | Wellington Place in Kennesaw, GA |
| Christmas Ornaments | Woodhaven Manor Nursing Home in Demopolis, AL |
| Christmas Party | Woodhaven Manor Nursing Home in Demopolis, AL |
| Cupcake Party | West Gate Village Nursing Home in Brewton, AL |
| Fall Festival | Nancy Hart Nursing Center in Athens, GA |
| Fall Festival | Northeast Rehab in Georgia (Roswell, GA office) |
| Fall Festival | Southern Oaks Assisted Living in Demopolis, AL |
| Fall Festival | Sonshine Manor in Dahlonega, GA |
| Fall Wreaths | Unnamed nursing home, Elberton, GA |
| Fashion Show | Atria Senior Living (location unknown) |

| | |
|---|---|
| Fiesta | West Gate Village Nursing Home in Brewton, AL |
| Game Day | Cedar Hill Assisted Living (location unknown) |
| Haircuts | Morningside Assisted Living Facility (Athens office) |
| Italian & Wine Night | Phoenix Nursing Home of Dunwoody, GA |
| Murder Mystery Theater | Sunrise in Buckhead in Atlanta, GA |
| Musical Entertainment | Providence Senior Living in Alpharetta, GA |
| Nurturing Artist - Music Monthly | Branan Lodge senior apartments in Blairsville, GA |
| Parade | Woodhaven Manor Nursing Home in Demopolis, AL |
| Petting Zoo | Magnolia Senior Living in Loganville, GA |
| Red Carpet Gala | Perry County Nursing Home (in Marion, AL?) |
| Remembrance Day | Willow Trace Nursing and Rehab in Butler, GA |
| Root Beer Floats | 5th Ave Nursing and Rehab in Rome, GA |
| Santa Claus | Riverwood Retirement Community in Rome, GA |
| Santa Claus | Southern Oaks Assisted Living in Demopolis, AL |
| Sorority massages and manicures | Oxton Place in Gainesville, GA (Athens office) |
| Spa & Smoothie Day | Riverwood Assisted Living Facility in Rome, GA |
| Spring Crafts | Heardmont Nursing Home in Elberton, GA (Athens office) |
| Tailgate | Westgate Village in Brewton, AL |
| Tree Lighting Ceremony | Brookdale of North Gilbert in Gilbert, AZ |
| Veterans Party | Cedar Hill Assisted Living in Selma, AL |
| Veterans Pinning Party | Southern Oaks Assisted Living in Demopolis, AL |
| Winter Wonderland | Marengo Nursing Home (in Linden, AL?) |

## ii.    The Events are Valuable Remuneration.

240.

The AKS bars all kickbacks, regardless of size.  But Homestead's kickbacks were of significant value; some individual events likely cost more than $1000, and even the inexpensive events aggregated to significant amounts given the sheer number of them.  These gifts and activities are of value to patients, both those who are on hospice and those who may one day need hospice.  The activities also are of significant value to the facilities themselves, which is why Homestead listed them in the marketing brochures that it hands out to the facilities.  Facilities for the elderly have to devote considerable resources to finding, planning and paying for activities that will entertain and occupy their residents.  Homestead gladly offers to take over the task, but for a price: referrals that will be paid for by Medicare and Medicaid.

241.

Homestead offers these events and programs in order to induce or reward patient referrals and the generation of hospice business payable by government-funded health care programs.

### d.    Homestead Hands Out Gifts, Lunches and Freebies to Referral Sources, Patients, and Potential Patients.

242.

Medicare warned hospice companies that they should have policies and procedures in place to prevent violations of the AKS, but instead Homestead urges its sales representatives to lavish meals and gifts on potential referral sources.

### i.    Homestead Lavishes Gifts on Potential Referral Sources.

243.

Homestead requires its sales representatives to pay for gifts and meals out of their own pockets; to be reimbursed, the employee must submit an expense report. With their own dollars on the line, Mr. Cole and the other representatives asked in searching detail about what limits the company set for spending and gift-giving. Homestead told the sales representatives that it did not have a specific limit. For example, Mr. Cole asked about the practice of providing meals to staff members at senior living facilities because he wanted to be sure he would be reimbursed. A.M.#1 told him, "Absolutely do it, they give us good business." Additionally, A.M.#1 told Mr. Cole to "take care of Sonshine" Manor, a prolific referral source for Homestead.

244.

In fact, A.M.#1 and Ms. Sharafat told Homestead's employees that they should never tell a patient or facility "no."  Ms. Sharafat told the employees that even if a patient or facility requested something that seemed ridiculous or impossible financially, the employee should not say "no."  Instead, the employee should contact the Homestead administrator, who will decide whether the request should be granted.  Ms. Sharafat told the employees: "Don't think about what can't be done.  Think about how we can make it happen!"  The quote also is emblazoned on Homestead's marketing brochures.  *See, e.g.*, Assisted Living Facility Collaboration Program at 3 (brochure p. 1) (Exh. 3); Skilled Nursing Facility Collaboration Program at 3 (brochure p. 1) (emphasis added) (Exh. 4).

ii.   <u>Examples of Gifts and Lunches.</u>

245.

As Homestead's insistence and direction, marketing representatives gave gifts and lunches such as the following.

246.

Mr. Cole regularly catered in lunch from Longhorn Steakhouse for up to 10 people at Sonshine Manor.

247.

Mr. Cole also catered Longhorn Steakhouse lunches to Dr. M.G.'s office of three.

248.

Jasper Neurology received lunches from Longhorn for 7 employees.

249.

Dr. K.M.'s office of 6 received Longhorn lunches.

250.

Dr. A.K.'s office of 6, Lifetime Medical, branched out into a different cuisine, getting a bimonthly lunch from Charlie's Italian.

251.

Dr. M.A.'s office of 5 also selected Charlie's Italian for its bimonthly lunch.

252.

Mr. Cole regularly provided Starbucks to a group of seven office employees at Jasper Neurology, at a typical cost of $45.

253.

When Mr. Cole first joined Homestead, the activities director at Cameron Hall in Canton, L.J., was upset with Homestead because it had cancelled activities at the last minute or provided the wrong items to assist with activities. She had kicked Homestead out, and Mr. Cole was assigned to restore the referral source. At

Homestead's request, he took Starbucks coffee and gifts to L.J. on a regular basis for a year and a half.

254.

Mr. Cole and the other marketers had to turn in a "Marketing Supply List" to the admissions coordinator before Monday of each week. "Marketing supplies" consisted of typical items such as forms and brochures, but also included gift items such as sticky notes, magnets, mugs, lanyards, pens, and "Cookie Trays (12 per tray)." The form also had checkboxes for representatives to request "gloves, chux [disposable underpads for use on beds], diapers, wipes, and pull ups." Notably, **these items were not called "medical supplies" or "patient supplies" – the company called them "marketing supplies,"** and they were given to patients for free, benefitting both the patients and the facilities caring for the patients.

255.

Mr. Cole was instructed to provide Ensure shakes for Cherokee Angels Personal Care Home patients.

256.

At Christmastime, Homestead administrator A.M.#1 instructed Mr. Cole to find out how many turkeys his referral sources needed. Emeritus at Woodstock Estates said they needed 6 turkeys; Sonshine Manor asked for 3 or 4.

257.

Homestead offered to install gardens and butterfly houses for all of the

facilities that referred patients:

> Homestead Hospice will provide and install a butterfly house for your
> outdoor garden. Each year we will add pieces to your garden area so
> that your residents can enjoy watching the butterflies as they sit in
> your garden. If a facility doesn't have a garden area, Homestead
> Hospice will provide volunteers to help all of our active accounts
> begin a garden area.

Assisted Living Facility Collaboration Program at 10 (brochure p. 7) (Exh. 3);

Skilled Nursing Facility Collaboration Program at 10 (brochure p. 7) (Exh. 4).

258.

On more than one occasion, patients asked Mr. Cole whether Homestead

could provide them with small refrigerators.  Mr. Cole contacted Homestead's

administrator A.M.#1, who decided that Homestead would provide the

refrigerators.

259.

Homestead's Facebook page boasts of: "Blankets, socks and toiletries that

were donated to our Homestead Patients from our Athens office."

260.

Homestead admitted that these gifts and events were for referral sources.  In

fact, **the reimbursement forms** the sales representatives filled out unabashedly

**asked what "referral source" got the gift** (Exh. 6).  For example, Mr. Cole's

reimbursement sheet for February 2014 asked for reimbursement for these items:

| "Date" | "Amount" | "Referral Source" | "Description" |
|---|---|---|---|
| 2/14/14 | $ 27.73 | Sonshine Manor | Valentine's Party |
| 2/4/14 | $ 10.30 | Sonshine Manor | Gift Basket |
| 2/20/14 | $ 17.80 | Sonshine Manor | In-service Prizes |
| 2/18/14 | $ 19.83 | Dr. J.P., NGA Medical | Gift Baskets |
| 2/20/14 | $ 33.17 | Sonshine Manor | Lunch/inservice |
| 2/11/14 | $ 18.18 | Dr. B.A., Gilmer Nursing Home | Valentine's Gifts |
| 2/14/14 | $ 13.08 | Dr. M.G., Dr. R.R., Dr. S.P. | Valentine's Gifts |
| **TOTAL** | $ 130.04 | | |

Homestead reimbursed Mr. Cole for all of these items.

261.

Homestead also reimbursed Mr. Cole for the following items purchased in

May of that year:

| "Date" | "Amount" | "Referral Source" | "Description" |
|---|---|---|---|
| 5/5/14 | $ 22.28 | Cameron Hall Canton | Cheese, paper towels, Cinco de Mayo party |
| 5/8/14 | $ 9.25 | Dr. B.A./Patient 3 | Ensure shakes |

| 5/14/14 | $ 142.33 | GA Cancer Blueridge | Lunch (17) people Circle J Steak House |
|---------|----------|---------------------|---------------------------------------|
| 5/15/14 | $ 84.44 | GA Cancer Jasper | Lunch, Chick-Fil-A |
| 5/15/14 | $ 30.57 | Benton House Woodstock | CEU Raffle |
| **TOTAL** | $ 288.87 | | |

262.

Homestead offers these gifts and lunches in order to induce or reward patient referrals and the generation of hospice business payable by government-funded health care programs.

<u>e.      Homestead Offers Free In-Service Classes to the Employees of Referral Sources.</u>

263.

Nursing homes, skilled living facilities and other medical providers are required to offer continuing education to their staff members.  Homestead offers a series of free in-service training classes to these facilities, in order to induce or reward patient referrals and the generation of hospice business payable by government-funded health care programs.

### i.    Offering Free Continuing Education to Garner Referrals is Forbidden Under the AKS.

264.

Normally an assisted living facility has to pay for its own inservice classes, which places a free inservice squarely in the category of "remuneration."

265.

"For purposes of the anti-kickback statute, 'remuneration' includes the transfer of anything of value, in cash or in-kind, directly or indirectly, covertly or overtly." OIG Advisory Opinion No. 98-1 (3/19/1998), *available at* **Error! Hyperlink reference not valid.**.  If a service saves a facility from having to incur its own expenses, it is considered a kickback under this definition.  For example, in a situation involving a contract between a City and an emergency ambulance service provider, OIG concluded:

> The items and services that the City would require the successful bidder to provide at no charge or pursuant to a nominal value lease—the Services, the Equipment, and the Training—are particularly suspect. These items and services are, and would remain, solely the City's expenses to incur, regardless of its decision to contract with a private ambulance supplier for the provision of emergency ambulance services in the City. Thus, the provision of these items and services at nominal or no cost to the City in exchange for the opportunity to be the City's exclusive supplier of emergency ambulance services, including those payable by Federal health care programs, would fit squarely within the language of the anti-kickback statute.

OIG Advisory Opinion No. 13-18 (Nov. 21, 2013), http://oig.hhs.gov/fraud/docs/advisoryopinions/2013/AdvOpn13-18.pdf.

266.

In fact, an attorney who says his goal is "to protect providers from lawsuits"

has explained that a hospice would violate the AKS by providing free inservice

courses:

> [S]uppose that Morpheus Hospice has the contract for hospice
> services in a nursing home, and a competing hospice, Advantage
> Hospice, wants the business. Advantage proposes that in return for
> recommending Advantage Hospice to nursing home patients,
> Advantage will provide monthly inservices at the nursing home to
> assist nurses with their continuing education credits. During these
> inservice presentations, free food is provided, pens are given away,
> and other items of value pass between the hospice and the facility's
> nurses. If the facility accepts this offer, both Advantage and the
> facility are breaking the law. The law not only prohibits offering the
> payment, it prohibits accepting the payment. Both entities could be in
> serious trouble.  While there are no financial records to establish the
> payment, if even one nurse is prepared to testify that she understood
> the switch of hospice providers was linked to the furnishing of
> freebies by the hospice, there is a good chance that someone will be
> spending the night in a federal lockup.

Tony Dewitt, *Legal Speak: The Big Gotcha*, Advance HealthcarePOV, *available at*

http://community.advanceweb.com/blogs/ltc_4/archive/2008/01/03/the-big-

gotcha.aspx (1/3/2008).

### ii.    Homestead Offers Free In-Service Classes to Staff Members of Facilities that Can Refer Business to Homestead.

267.

As if determined to follow the "what not to do" script written out by defense

lawyer DeWitt, Homestead offers free in-service classes at personal care homes

and living facilities, and even hands out prizes to staff members who take the classes.

268.

Homestead is so convinced that the inservice classes will generate business that it devotes about ⅓ of its sales brochure to describing the selection of 18 in-service course offerings, ranging from Fall Prevention to First Aid/CPR, that it is willing to provide for free.  Assisted Living Facility Collaboration Program at 5 (brochure p. 3) (Exh. 3); Skilled Nursing Facility Collaboration Program at 5 (brochure p. 3) (Exh. 4); and Homestead's Hospice Diagnoses & Guidelines at 21. Topics like wound care instruction and HIV/AIDS education are available regardless of whether any of the residents being serviced by Homestead has a wound or HIV/AIDS.  And if for some reason the usual menu of classes is not sufficient, Homestead offers to: "develop other presentations to suit your needs." Assisted Living Facility Collaboration Program at 8 (brochure p. 6) (Exh. 3); Skilled Nursing Facility Collaboration Program at 8 (brochure p. 6) (Exh. 4). Additionally, in the "Communication Binder" Homestead leaves in every facility where it has a patient, Homestead reminds the facilities about the in-services and reiterates: "We can also customize a presentation based on your needs."

269.

Homestead offers the programs to any healthcare provider who might send
Homestead business: "If you are a healthcare professional and would like to have a
presentation given for you and your staff, please feel free to contact your
Community Relations Manager to see how we can meet your needs. We also have
Continuing Education Accreditation on some topics." Hospice Diagnoses &
Guidelines at 21.

### iii. Homestead Has Its Sales Representatives Teach the Inservice Classes.

270.

To punctuate the fact that Homestead is offering the inservices in order to
lure in business, almost all of the classes are offered **by Homestead's sales
representatives**, not by healthcare providers.

271.

Homestead passes out instruction sheets and dispatches its sales
representatives – most or all of whom have no medical training whatsoever – to
teach classes.

272.

For example, Mr. Cole was sent to teach infection control to nurses; he felt quite uncomfortable with the assignment, since his "students" obviously had much more training in the area than he did.

273.

Using the instruction sheets handed out by Homestead, Mr. Cole and the other marketing representatives gave in-service presentations throughout their territories.  For example, Mr. Cole gave two presentations at Cameron Hall in Ellijay, an assisted living facility that Homestead was courting in hopes of referrals.  He also gave presentations to Cameron Hall in Canton, Sonshine Manor, Serenity in Jasper, and Gilmer Nursing Home in Ellijay.

274.

In one Inservice outline, Homestead told its sales reps that when they gave an in-service, they should give a quiz at the end of the presentation and: "Give prizes for right answers.  Small $ store stuff works."  Sales reps loaded up on prizes like candy, picture frames, small vases, lotions, and shower gel, from stores such as Bed Bath and Beyond, and passed the prizes out to every person who took an in-service class.

### iv.    Homestead's In-Services Were Valuable Remuneration.

275.

In order to remain qualified to work with patients, CNAs and other care providers have to take continuing education courses.  By providing these classes for free, Homestead relieved nursing homes and elder living facilities of the burden of providing the in-services and tracking employees' compliance.

### (A)    The Facilities Were Required to Provide Inservices.

276.

All 4 states where Homestead has offices require continuing education for the staff members at personal care homes and assisted living facilities.

277.

**Georgia.**  Georgia requires extensive, yearly continuing education for staff members who provide care or services to patients in personal care homes, skilled nursing facilities and assisted living facilities.  For example, personal care home staff who provide direct care to patients must take 16 hours of continuing education a year on topics such as working with the elderly or with Alzheimer's patients, medication assistance, legal issues, safety, etc.  R. Ga. Dep't of Community Health § 111-8-62-.09 (4)-(5) (1/8/2013).  In their first six months on the job, staff who provide hands-on care for dementia patients must get additional

training on issues related to patients with Alzheimer's and other dementias.  *Id.* at §

111-8-62-.19 (6) (1/8/2013).  At nursing homes, even dining assistants must get 16

hours of training in areas such as "feeding and hydration," infection control, safety

and emergency procedures, reporting requirements, and resident rights.  *See id.* at §

111-8-56.03 (3/13/2013).

278.

Staff members at assisted living facilities must get 24 hours of continuing

education in their first year, with 8 additional hours if they work with dementia

patients.  The classes have to cover such topics as CPR, first aid certification,

precautions to use with elderly patients, legal issues, recognizing and reporting

abuse, neglect and exploitation, resident rights, and medication assistance, all of

which are topics covered in Homestead's extensive offering of in-services.  *See id.*

at § 111-8-63-.09(5) (1/2/2012).  After the first year, the staff members still need 16

hours per year, on the same topics, with two hours devoted to dementia care if

appropriate.  *See id.* at § 111-8-63-.09(6).

279.

***Alabama.***  In Alabama, nursing facilities have to provide their aides with

"no less than 12 hours per year" of in-service education, and staff caring for

patients with dementia need an additional 6 hours of continuing education yearly.

If an aide cares for the cognitively impaired, the education also must address that area. *See* R. Alabama State Board of Health § 420-5-10-.03(15) (5/25/2005).

280.

Alabama has similar rules for assisted living facilities: "All staff members of a specialty care assisted living facility shall have at least six hours of continuing education." *See* R. Alabama State Board of Health §§ 420-5-20-.04(11)(a) (4/25/2007) and 420-5-4.04(4) (10/1/2015). Both assisted living facilities and specialty assisted living facilities have to provide six hours of initial training to staff members who have contact with residents, as well as continuing education as needed. The training has to cover topics such as the laws and rules related to assisted living facilities, identifying and reporting abuse, neglect and exploitation, basic first aid, Advance Directives, dementia issues, and nutrition and hydration for dementia patients (for the specialty ALF) — again, precisely the sort of topics Homestead offers. *See id.* at § 420-5-10-.04(11)(b). *See also id.* at § 420-5-4.04(4).

281.

***South Carolina.*** In community residential care facilities, all staff members, direct care volunteers and private sitters and other personnel must have annual inservice training in CPR, basic first aid, infections, dementias (as needed), patient

rights, etc.  *See* Standards for Licensing Community Residential Care Facilities, R. 61-84 § 504 (6/26/2015).

### 282.

At least annually, every staff member at a nursing home must receive training in topics such as resident rights; direct care staff members also need training in additional topics such as management of communicable diseases.  *See* Standards for Licensing Nursing Homes, R. 61-17 § 606 (3/25/2016).

### 283.

*Arizona.*  The administrator of a nursing care institution has to create an in-service program tailored to the specific duties of each personnel member, employee, volunteer and student.  *See* Ariz. Admin. Code, R9-10-403 and R9-10-406 (9/30/2015).  Similarly, the administrator of an assisted living facility has to create, document and implement an in-service program for employees and volunteers.  *Id.* at R9-10-803.

### 284.

Homestead offers free classes on most or all of the subjects that all four states required.

*(B)    The in-service courses had value.*

285.

Homestead made no bones about the fact that it was offering in-service presentations as something of value (*i.e.*, remuneration): "The following in-services are offered by Homestead Hospice & Palliative Care *to assist you in the education of your staff*." Assisted Living Facility Collaboration Program at 5 (brochure p. 3) (Exh. 3); Skilled Nursing Facility Collaboration Program at 5 (brochure p. 3) (Exh. 4)(emphasis added). Homestead also reminded the facilities that the in-services would help them meet their licensing requirements, including for topics that had nothing to do with hospice services: "We have included topics that may be required for your staff each year *outside of the hospice realm*. We have also included topics that enhance the delivery of care in your building. Let us *help you meet your education requirements*. Call us today to schedule the following in-services for your staff." *Id.* (emphasis added).

286.

While Homestead offers its in-service classes for free, the marketplace charges for identical classes. *See, e.g.,* Ceus-r-ez.com Inservice Course Catalog, *available at* https://www.nurseslearning.com/ceus-r-ez/catalog.cfm. One marketplace education provider, Care and Compliance Group, which bills itself as "the best continuing education value in the industry," offers training courses in

bundles for multiple staff members.  For example, a Georgia assisted living facility can pull six topics from a list for $698.99, or receive a training kit package for $2798.99.  The assisted living facility can add on a module for dementia care for $1198.99, or select a module for companion sitters or for medication training for $698.99.

287.

This chart compares Homestead's free, in-service classes to the selection and price offered by two of the most cut-rate, online providers.  Of course, since Homestead's courses were offered in person, they would be expected to command a higher price than an online class.

| Homestead Course Offering | Cost | In-Service Offering by ceus-r.ez.com | Cost | Care and Compliance Group ("the best continuing education value in the industry") | Cost |
|---|---|---|---|---|---|
| Introduction to Hospice | Free | | | Georgia Assisted Living Training Kit<br><br>Bundle of 3 (Direct Care, Dementia and Medication) | $2798.99 |
| Abuse, Neglect and Exploitation | Free | | | Recognizing and Reporting Elder Abuse | $998.99 |

| | | | | | (Direct Care Package) |
|---|---|---|---|---|---|
| Infection Control | Free | Infection Control and Universal Precautions | $30/ person | Infection Control | (Direct Care Package) |
| Fall Prevention | Free | Causes and Prevention of Falls in the Elderly | $35/ person | Wheelchairs and Other Ambulatory Aides [sic?] | (Direct Care Package) |
| Introduction to Pain and Symptom Management | Free | | | | |
| Caring for Patients with Dementia/ Alzheimer's Disease | Free | Alzheimer's and Dementia, Care of the Confused | $10/ person | Dementia Care<br><br>Companion Sitter Training | $1198.99<br><br>$89.91/ person |
| Medication Management | Free | Medication Errors<br><br>Medication Errors: Can Be Deadly<br><br>Medications in Assisted Living | $25/ person<br><br>$15/ person<br><br>$15/ person | Medication Training | $698.99 |
| Quarterly First Aid/CPR Training | Free | | | | |
| Annual Conference Addressing Regulatory Changes | Free | | | | |
| Incident Reporting/ | Free | | | Medication Training (?) | (In Medication |

| | | | | | |
|---|---|---|---|---|---|
| Adverse Reactions | | | | | training package?) |
| Resident Rights in an Assisted Living Facility | Free | Residents' Rights | $20/person | | |
| HIV/AIDS | Free | HIV/AIDS and STD's | $21/person | HIV/AIDS | $15.99/person |
| Artificial Hydration and Nutrition | Free | | | Food Safety in Residential Care | (Direct Care Package) |
| Wound Care | Free | | | Skin Breakdown | $19.99/person |
| Advanced Directives | Free | Are Medical Ethics and Advance Directives Important? | $12/person | | |
| Stages of Grief from Mourning to Joy | Free | | | Grief and Loss | $15.99/person |
| Signs and Symptoms of Impending Death | Free | Death and Dying | $12.50/person | End of Life Care | $15.99/person |
| Providing Great Customer Service | Free | | | | |

288.

While the online providers were charging for these course, Homestead was

providing them for free. For example, on January 20, 2014, Mr. Cole gave a 1-

hour in-service on "Infection Control and Precautions" at Sunshine Manor in Jasper.  Ten employees took the class.

289.

Mr. Cole also gave an infection control class at Cameron Hall Ellijay.

290.

On or around January 27, 2016, Homestead provided CPR training at Pee Dee Gardens in Florence, SC.  At least 6 of Pee Dee Gardens' employees attended the class.

f.    Free Social Services Programs.

291.

Homestead also offers a slew of other programs to patients, family members and staff at facilities that are likely to refer business.

292.

**Social Services Connections Program.**  Homestead's brochure explains that the hospice will provide a "Social Service Connections Program to offer [assisted living and skilled nursing facilities] effective ways to help residents, families and staff."  The program, according to Homestead, can help the facility "solidify relationships with residents' families and staff members and increase satisfaction regarding the care that residents receive while at your facility."

Assisted Living Facility Collaboration Program at 10 (brochure p. 8) (Exh. 3);

Skilled Nursing Facility Collaboration Program at 10 (brochure p. 8) (Exh. 4).

293.

**Memorial Services.**  Homestead tells facilities that it: "believes in

memorializing all residents [*i.e.*, not just former Homestead patients] who died

throughout the year. We coordinate a service to allow people to say goodbye in a

healthy way.  Coming back to your facility for a formal service gives many family

members the chance to say goodbye and show their appreciation to your team."  *Id.*

294.

**Staff Support Groups.**  Homestead also offers support groups for the

employees at the skilled nursing or assisted living facility:

> When residents die, your busy staff can't always process their feelings
> of loss and grief in a healing and healthy manner. We provide support
> groups at your facility to help address these emotions. We also provide
> last minute support groups in the case of a crisis or if you have had a
> large number of losses over a short period.

*Id.*

295.

**Family Night Education Meetings.**  In addition to providing free classes

for residents, Homestead offers free classes for the family members of residents:

"Our Community Relations Manager, social service staff, physicians and nurses

are available to meet with your families after hours for a family night presentation. Topics may include anything from health issues to advanced directives." *Id.*

296.

**Family Support Groups.** Homestead offers to "provide support groups for families on-site, at facilities where Homestead Hospice patients reside." *Id.* Homestead broadly offers the groups to the families of all the residents of the facility.

297.

**Bereavement Support Groups.** Homestead offers family members a 6-week bereavement support group called the "Journey from Mourning to Acceptance." "Our participants share in a variety of educational and therapeutic sessions which encourage the healing process following the loss of a loved one." Hospice Diagnoses & Guidelines at 23. "In addition to standard hospice bereavement programs, our 6-week bereavement program, called The Journey of Healing, is available quarterly to our patients' families **and to anyone** grieving in the communities we serve." Homestead's Life's Most Important Journey Folder at 3 (emphasis added).

298.

Homestead offers these events and programs in order to induce or reward patient referrals and the generation of hospice business payable by federally-funded health care programs.

g.    Free articles.

299.

Homestead trained Mr. Cole and the other marketing representatives to cold call physicians who are not yet referring patients to Homestead.  As scripted by Homestead, the marketers offer the doctors the opportunity to "get your name out there" by publishing an article – for free – in Homestead's newspaper.  The article will be a great marketing opportunity, the marketers explain, because the newspaper has a circulation of 75,000 and back issues are kept online indefinitely.

300.

Homestead offers these articles in order to induce or reward patient referrals and the generation of hospice business payable by federally-funded health care programs.

**4.    *As Congress and Medicare Feared, Homestead's Kickback Scheme Gives It a Competitive Advantage.***

301.

One of the most pernicious effects of Homestead's exhaustive kickback system is that other hospice providers have found it extremely difficult to compete

with Homestead.  OIG warned about the fact that kickback schemes will warp the

health care market:

> Offering valuable gifts to beneficiaries to influence their choice of a
> Medicare or Medicaid provider raises quality and cost concerns.
> Providers may have an economic incentive to offset the additional
> costs attributable to the giveaway by providing unnecessary services
> or by substituting cheaper or lower quality services. The use of
> giveaways to attract business also favors large providers with greater
> financial resources for such activities, disadvantaging smaller
> providers and businesses.

Special Advisory Bulletin on Offering Gifts to Beneficiaries (Aug. 2002), *available

at* http://oig.hhs.gov/fraud/docs/alertsandbulletins/SABGiftsandInducements.pdf.

Medicare's fears have been borne out by Homestead's kickback scheme.

302.

Mr. Cole learned how significant Homestead's competitive advantage is

when he left Homestead and took a job with a new hospice.  He assumed that his

new employer had "transitional care" and he asked the administrator, P.H., for

details about the program.  P.H. told him she had never heard of the kind of care he

was talking about, and explained to him that hospice only has four billing codes,

none of which is called "transitional care."

303.

Without being able to offer "transitional care," Mr. Cole found he could not

compete with Homestead.  For example, Mr. Cole knew the decision-makers at

Cherokee Northside Hospital and they gave him a chance to pitch his new

employer. But during his pitch, the hospital's discharge planners repeatedly asked whether his new hospice provided "transitional care" like Homestead did. They told Mr. Cole that the "number one reason" they chose Homestead was that every patient who left the hospital under Homestead received "transitional care."

304.

The competitive disadvantage affected all of the sales representatives at Mr. Cole's new hospice. At the yearly Regional Sales meeting on January 18, 2016, sales representatives and administrators repeatedly asked what the company could do to compete with Homestead.

305.

The kickbacks also hurt business for Mr. Cole's next employer. One of his new colleagues confided to Mr. Cole that she had been forced out of a Roswell senior living facility that had been an important portion of her business, after Homestead elbowed its way in with freebies and kickbacks.

306.

Homestead's actions edged out competition that might have driven prices lower or increased the availability of services to medically underserved populations.

## C.    Homestead Admitted Patients Who Did Not Qualify for Hospice Care.

307.

In addition to overbilling continuous care and bribing its way to financial success, Homestead also defrauds the Government by admitting patients who are not eligible for hospice care in the first place, because they are not within six months of dying. In fact, Homestead told families and facilities that it was a "myth" that "Hospice is only for people in their last days of life." See Homestead's "Life's Most Important Journey" Brochure at 4. Furthermore, knowing that many of its patients would receive care for longer than six months, Homestead set the stage by suggesting that: "[b]ringing hospice care to a person in his/ her last few months of life can ease pain and manage symptoms, **possibly even extending life a little**." Homestead's Hospice Diagnoses & Guidelines at 13 (emphasis added). Homestead encouraged referrals from anyone, anytime: "Anyone can recommend a patient for hospice care by calling our office, 24 hours a day." Homestead's "Life's Most Important Journey" Brochure at 2.

308.

Indeed, instead of coming up with policies and procedures that could ensure that Homestead only serves eligible patients, the company pressures its marketers to build up the patient census and it bases their compensation on the number of patients they bring in. At the same time, Homestead does not train its marketers

128

about which patients are appropriate for hospice. Homestead also strategically selects potential referral sources and hires them or their loved ones.

### 1. *Homestead Pressures Sales Reps to Bring in Patients.*

309.

Homestead relentlessly pressures its marketers to meet admissions and census targets. At the same time, Homestead provides virtually no training to its marketers on which patients are eligible for hospice care, and in fact the sales reps are not supposed to consider that question at all. To the contrary, the marketers are told to generate as many referrals as possible and let Homestead sort out the rest. The result is predictable: Homestead regularly enrolled patients who are not within 6 months of death and who are not eligible for hospice care.

310.

Mr. Cole and the other marketers were constantly reminded that they needed to "make their numbers," *i.e.*, get a certain number of new patients admitted to Homestead each month. In Mr. Cole's first month at Homestead, he was required to bring in 5 new patients to keep his job. Homestead paid the sales representatives a $250 bonus for each patient they brought in over their minimum requirement.

311.

The numbers got higher and more difficult to achieve the longer a marketer worked for the company.  Ultimately Mr. Cole was required to bring in 9 admissions a month to keep his job.  Homestead terminated him because he did not "make his numbers."

### 2.    *Hiring Referral Sources.*

312.

To boost referrals, Homestead also uses a strategic system of hiring potential referral sources or their loved ones.

313.

*Hiring referral sources.*  For example, C.G. was the administrator of Roman Court Assisted Living, a nine-patient facility in Rome, Georgia.  Homestead hired C.G.'s wife, P.G., as a Community Relations Manager.  At P.G.'s suggestion, Homestead also placed two CNAs in Roman Court.  For its part, Roman Court locked every other hospice out of its facility, only allowing Homestead Hospice to admit patients living at Roman Court.

314.

R.C. worked for Homestead as a full-time social worker.  She also worked part-time on the weekends in discharge at Piedmont Mountainside Hospital in Jasper, Georgia, which referred patients to Homestead.

315.

*Medical Directors.*  Homestead also hired numerous medical directors,

based on their ability to refer patients.  In Mr. Cole's experience, most of these

medical directors did not see Homestead patients in their homes; in fact, a number

of the physicians worked a significant distance from where the patients lived.

Critically, however, from Homestead's point of view, most of the medical directors

were associated with nursing homes or hospitals that could be lucrative referral

sources for Homestead.

316.

While the relationship never came to fruition, Homestead also tried to recruit

Dr. M.A. as a medical director for the hospice's Ellijay office.   Tellingly,

Homestead picked three people to attend the meeting with Dr. M.A.: Homestead's

president, its marketing director, and sales representative Clete Cole.

317.

The Cartersville office where Mr. Cole worked had four medical directors

and an associate medical director.  None was located particularly near the

Homestead office, but Homestead strategically selected them because they could

refer hospice patients.

318.

Dr. S.D., one of the directors, works 50 minutes to an hour away, in Douglasville.   However, he specializes in Geriatric Medicine, which makes him a very useful referral source for Homestead.  Additionally, he rounds at Douglas Nursing Home, where Homestead has two CNAs, and he admits patients on a regular basis.

319.

Dr. A.C. practices in Calhoun, Georgia, 36 to 47 minutes away from Cartersville.  A.M.#1, the Homestead administrator in Calhoun, was dating Dr. A.C.  A.M.#1 brought Dr. A.C. on board as a medical director for Homestead's Calhoun office.  An internal medicine physician, he is particularly useful because of his affiliations with Gordon Hospital, Kennestone Hospital and Redmond Regional Hospital.  Dr. A.C. and A.M.#1 are now married and Dr. A.C. continues to work as the medical director.

320.

Cartersville medical director Dr. A.E. works in Douglasville, Georgia, which is 50 minutes to an hour from Cartersville, and Powder Springs, which is 45 minutes from Cartersville.  Importantly for Homestead, he practices Hospice & Palliative Care (as well as Family Medicine) at Wellstar Cobb Hospital.

321.

Cartersville Assistant medical director Dr. B.T. works in Austell, Georgia, 49 to 53 minutes from Cartersville, and in Riverdale, GA, which is an hour to an hour and 23 minutes from Cartersville.  Importantly to Homestead, he is a hospitalist and refers people to hospice.

322.

Homestead also referred business back to the medical directors.  When patients were referred by other doctors, Homestead employees were told to encourage the patients to turn their care over to a Homestead Medical Director. The patients could keep their primary care physician, Homestead employees were trained to say, and Homestead would "keep him in the loop."  However, by turning the care over to a Homestead Medical Director, Homestead could "do everything in one stop" and could "help in the middle of the night."

### 3. *Homestead Manipulated Its Census to Conceal the Fact that Many Patients Were Not Expected to Die Within 6 Months.*

323.

Although Medicare and Medicaid compensate a hospice based on the daily care it gives to each patient, CMS does impose an annual per-patient average cap for reimbursements (the "Aggregate Cap").  Homestead intentionally manipulated this rule in order to get paid for patients who were not qualified for hospice.

324.

Medicare's cap does not affect the payment for any individual patient; instead, it limits the amount a hospice can receive per patient, *averaged across all patients*. Medicare figures that, while individual patients may outlive the expectation, if a hospice is hewing to Medicare's standards, then *on average* the hospice's patients should die within 6 months. If a hospice exceeds the Aggregate Cap, at the end of the year it must refund the excess amount it was paid.

325.

In 2015, the Aggregate Cap was $27,382.63. Thus, for 2015, Medicare limited its payments to Homestead to $27,382.63 multiplied by the total number of hospice patients Homestead enrolled that year. For 2016, the Aggregate Cap was raised to $27,820.75.

326.

Homestead came up with a way to manipulate the cap, however. As Homestead neared the cap it encouraged its sales representatives to go out looking for patients who were about to die imminently so that Homestead could bring its average down, but continue to get paid for patients who were on hospice much longer than 6 months.

## 4. *Specific Incidents.*

### *327.*

Mr. Cole was aware of several Homestead patients who were admitted for hospice care, but who were not imminently dying. For example, as described *supra*, Homestead provided one-on-one, "transitional care" for Patient 2 when she switched from Canton Nursing Home to Sonshine Manor. Patient 2 rode to the new nursing home with her daughter, in her daughter's car. Mr. Cole was present and saw that Patient 2 was in a relatively healthy state and not in any medical distress; she clearly did not need hospice care. In fact, when Mr. Cole last heard, Patient 2 was still living, nearly 3 years after she transferred to Sonshine Manor.

### 328.

In a separate incident, one Saturday Mr. Cole and Dr. A.C. (one of the medical directors for Homestead Cartersville) went out to a patient's home in Jasper, Georgia. Even as a layman, Mr. Cole was able to see that the patient did not appear to be dying. Nonetheless, Dr. A.C. admitted the patient.

### 329.

In short, Homestead used inappropriate diagnoses — diagnoses that were not supported by the patients' medical condition - in order to falsely and fraudulently certify or re-certify patients for hospice care. The above examples are only representative; Homestead used improper diagnoses and diagnosis codes to

fraudulently justify hospice care on a regular basis with many Homestead patients. Homestead then used these fraudulent justifications and certifications to submit false and fraudulent statements and claims for payment to Medicare and Medicaid.

330.

In all cases in which Homestead certified or re-certified ineligible patients for hospice care, Homestead submitted these fraudulent certifications, and fraudulent claims that were based on the certifications, for payment in order to be reimbursed for the care of these ineligible patients. The Center for Medicare Services, in reliance on these certifications and other fraudulent claims and statements, and without knowledge of their falsity, reimbursed Homestead for the provision of hospice care for ineligible patients.

## IV.  DAMAGES FROM FALSE CLAIMS.

331.

By demanding reimbursement for unnecessary continuous care and unnecessary hospice care, and by offering kickbacks for business, Homestead has bilked Medicare, Medicaid, and other government-funded healthcare programs of millions of dollars.

Homestead has made fraudulent representations with respect to the medical conditions of many of its patients, enrolling them in hospice care or keeping them on hospice care when they did not qualify for such care. Homestead also has made fraudulent representations with respect to whether its patients need continuous care. Furthermore, Homestead has handed out kickbacks in order to get government-funded healthcare business.

### A.    Homestead Submits Claims to Medicare and Medicaid.

332.

Homestead intends to and does submit claims for hospice services to government-funded healthcare programs. Medicare pays for virtually all of Homestead's patients; Medicaid pays for a small portion, as do TRICARE and CHAMPVA (Civilian Health and Medical Program of the Department of Veterans Affairs).

333.

On its "Daily Census Summary," Homestead divides patients — including those receiving continuous care — into "Medicare", "Medicaid" and "Other Ins[urance]".

334.

On July 1, 2014, the Cartersville office had 131 patients.  Of the 131 patients, 126 were Medicare patients and 3 were Medicaid patients.  Only two patients were not either Medicare or Medicaid patients.

335.

In its marketing materials, Homestead tells patients: "Most patients use Medicare to pay for hospice care. . . Medicaid and private insurance will also pay for hospice benefit depending on the circumstances and the state in which you live."  Homestead's "Patient and Family Guide to Hospice" at 4.

336.

Patients must sign a consent form that states: "I/we understand that hospice services are fully paid under Medicare, Medicaid or other Government Programs. I request payment of authorized benefits be made directly to Homestead Hospice." Hospice Informed Consent, Hospice Admission Paperwork at 8.

337.

Homestead requires patients to sign a Medicare "Hospice Benefit Election", agreeing that "Creative Hospice Care, Inc. d.b.a. Homestead Hospice & Palliative Care, in conjunction with my physician, will manage all care related to the hospice diagnosis *under the Hospice Medicare Benefit*."  Hospice Benefit Election, Hospice Admission Paperwork at 6 (emphasis added).   Medicare and Medicaid

patients must check a box stating: "I request that payment be made to Creative

Hospice Care, Inc. d.b.a. Homestead Hospice & Palliative Care on my behalf." *Id.*

The patients also have to authorize Homestead "to release any medical record

information to authorized representatives of Medicare, Medicaid, Insurance

Company or third party payor in order to determine Hospice benefit." *Id.*

338.

Medicare patients must fill out a "Medicare Secondary Payer

Questionnaire." Hospice Admission Paperwork at 12.

339.

Medicaid patients sign a "Medicaid Hospice Election Form" informing them

that they are "entitled to Medicaid sponsored hospice services as long as I am

Medicaid eligible..." Hospice Admission Paperwork at 18. A representative of the

facility where the patient lives also signs the document to show it understands that:

"Medicaid reimburses the hospice provider for nursing facility room and board

when the individual resides in the nursing facility and the hospice reimburses the

nursing facility for room and board charges." *Id.*

340.

Patients who are transferring to Homestead from another hospice fill out a

"Hospice to Hospice Transfer" form referring to their rights under "Federal

Medicare hospice regulations." Hospice Admission Paperwork at 3. Patients

transferring under Medicaid fill out a similar form.  Hospice Admission Paperwork
at 4.

341.

Nursing facilities sign a document identifying the patient's "admission level
of care" and stating whether the hospice services will be covered by Medicare,
Medicaid or some other method.  *See* Facility Notification of
Admission/Change/Discharge.

342.

Mr. Cole has personally witnessed patients, families and facilities fill out all
of the forms listed above so that Medicare or Medicaid would pay for the patients'
hospice care.

343.

"Homestead Hospice Staff Admission Checklist for Legal Paperwork" tells
sales reps to inform patients that the "Medicaid Election Form" has to be filled out
"for Medicaid specific purposes."  Additionally, it explains that the Medicare
Secondary Payor Form "is a requirement of Medicare to ensure that they are not
eligible for other Medicare programs. . ."  Hospice Admission Paperwork at 2.

344.

Homestead prepared a chart, "Homestead Hospice & Palliative Care Levels of Care," which shows that a hospice is reimbursed, by Medicare, at a daily rate (for three of the four types of care) or an hourly rate (for continuous care).

345.

Homestead published a "Physician Billing Flowchart" that explains how Medicare gets billed for physician care during hospice.  For physicians employed by Homestead, the document explains, "Hospice bills Medicare Part A" for the physicians' services and then reimburses the physicians.  The document also explains when payments to doctors "count against [the] cap" on the amount Medicare or Medicaid will pay for hospice care.

346.

In the Communication binder that Homestead left with nursing facilities, Homestead told the facilities that hospice was "a benefit to you" because "Medicare allows hospice to take care of some chronically ill patients" and Medicare pays 100% of "out-of-pocket expenses for family." The binder had a chart showing the "Comparison of Hospice and Home Health Benefits Under Medicare."

## B.    Medicare's Reimbursement System.

347.

Medicare and Medicaid reimburse Homestead and other hospice companies for each day of care they provide to a patient.  The rate varies depending on which of the four types of hospice care the patient is receiving: routine home care, continuous home care, inpatient respite care, or inpatient care.  By far the largest percentage -- 94% -- of hospice care is routine home care, which is good news for taxpayers given that the rate hospices get for continuous home care is more than 500% of what they receive for routine home care.

348.

In past years, Medicare has paid the following reimbursements for hospice care:

| Daily rate for . . . | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|
| Routine home care (94%) | $151.03 | $153.45 | $156.06 | $159.34 | $186.84 (days 1-60) $146.83 (days 61+) |
| Continuous home care | $881.46 | $895.56 | $910.78 | $929.91 | $944.79 |
| Inpatient respite care | $156.22 | $158.72 | $161.42 | $164.81 | $167.45 |
| Inpatient care | $671.84 | $682.59 | $694.19 | $708.77 | $720.11 |

| AGGREGATE PER PATIENT CAP | $24,527.69 | $25,377.01 | $26,157.50 | $27,382.63 | $27,820.75 |
|---|---|---|---|---|---|

## COUNTS

### 349.

The allegations set forth in the preceding paragraphs of this Complaint are realleged as if fully set forth below.

### 350.

All of the conduct alleged in this Complaint is alleged to have occurred "knowingly" or with reckless disregard, as those terms are defined in the False Claims Act, 31 U.S.C. § 3729, the Georgia Medicaid False Claims Act, and related case law.

### 351.

Defendants submitted false claims for hospice services premised upon Defendants' fraudulent certification of compliance with Government healthcare regulations as made in claim forms submitted to Medicare and its intermediaries and through the Fiscal Intermediary Standard System (FISS), and to Medicaid and other government-funded healthcare programs.

### 352.

Defendants expressly certified and stated that:

(a)    Defendants complied with federal and state laws and regulations, when Defendants knew or should have known they had not done so;

(b)    Defendants complied with the Anti-Kickback statute, when Defendants knew or should have known that they had not done so;

(c)    Defendants provided and billed for hospice care and services that were reasonable and necessary for Defendants' patients, when in fact they were not reasonable and necessary;

(d)    Defendants provided and billed for hospice care and services that were reasonable and necessary for Defendants' patients, when in fact the Defendants had not determined whether or not they were reasonable and necessary;

(e)    Defendants provided and billed for levels and types of hospice care and services that were reasonable and necessary for Defendants' patients, when in fact they were not reasonable and necessary;

(f)    Defendants provided and billed for levels and types of hospice care and services that were reasonable and necessary for Defendants' patients, when in fact the Defendants had not determined whether or not the levels and types were reasonable and necessary;

(g)    Defendants' patients were qualified and eligible to receive the levels and types of care and services Defendants provided to the patients, when in fact they were not;

(h)     Defendants' patients were qualified and eligible to receive the levels and types of care and services Defendants provided to the patients, when in fact the Defendants had not determined whether or not the patients were qualified and eligible;

(i)     Defendants were qualified and eligible to provide the level of care and services Defendants provided to the patients, when in fact Defendants were not;

(j)     Defendants were qualified and eligible to provide the level of care and services Defendants provided to the patients, when in fact the Defendants had not determined whether or not they were so qualified and eligible;

(k)     Defendants had made true and accurate records and statements material to obligations to pay or transmit money or property to the Government, when in fact they had not;

(l)     Defendants had made true and accurate records and statements material to obligations to pay or transmit money or property to the Government, when in fact they had not determined whether they had done so;

(m)    Defendants had no obligation to pay or transmit money or property to the Government, when in fact they did;

(n)     Defendants had no obligation to pay or transmit money or property to the Government, when in fact they had not determined whether or not they had such an obligation.

353.

Defendants impliedly certified and stated that:

(a)     Defendants complied with federal and state laws and regulations, when Defendants knew or should have known they had not done so;

(b)     Defendants complied with the Anti-Kickback statute, when Defendants knew or should have known that they had not done so;

(c)     Defendants provided and billed for hospice care and services that were reasonable and necessary for Defendants' patients, when in fact they were not reasonable and necessary;

(d)     Defendants provided and billed for hospice care and services that were reasonable and necessary for Defendants' patients, when in fact the Defendants had not determined whether or not they were reasonable and necessary;

(e)     Defendants provided and billed for levels and types of hospice care and services that were reasonable and necessary for Defendants' patients, when in fact they were not reasonable and necessary;

(f)     Defendants provided and billed for levels and types of hospice care and services that were reasonable and necessary for Defendants' patients, when in fact the Defendants had not determined whether or not the levels and types were reasonable and necessary;

(g)    Defendants' patients were qualified and eligible to receive the levels and types of care and services Defendants provided to them, when in fact the patients were not qualified and eligible;

(h)    Defendants' patients were qualified and eligible to receive the levels and types of care and services Defendants provided to them, when in fact the Defendants had not determined whether or not the patients were qualified and eligible;

(i)    Defendants were qualified and eligible to provide the levels and types of care and services Defendants provided to the patients, when in fact Defendants were not qualified and eligible;

(j)    Defendants were qualified and eligible to provide the levels and types of care and services Defendants provided to the patients, when in fact the Defendants had not determined whether or not they were qualified and eligible;

(k)    Defendants had made true and accurate records and statements material to obligations to pay or transmit money or property to the Government, when in fact they had not;

(l)    Defendants had made true and accurate records and statements material to obligations to pay or transmit money or property to the Government, when in fact they had not determined whether they had done so;

(m)     Defendants had no obligation to pay or transmit money or property to the Government, when in fact they did;

(n)     Defendants had no obligation to pay or transmit money or property to the Government, when in fact they had not determined whether or not they had such an obligation.

354.

At the time the Defendants made these express and implied certifications, they knew the certifications were material to Medicare, Medicaid and other government-funded healthcare programs, and to the programs' decisions as to whether and at what level to compensate the Defendants for their claims or to demand reimbursement of payments made on those claims.

355.

At the time the Defendants made these express and implied certifications, they knew they had withheld information that was material to Medicare, Medicaid and other government-funded healthcare programs, and to the programs' decisions as to whether and at what level to compensate the Defendants for their claims or to demand reimbursement of payments made on those claims.

356.

The Defendants made these express and implied certifications knowing they were false or with reckless disregard as to whether or not they were true.

357.

Defendants, like all medical providers making claims against Medicare or other government-funded healthcare programs, had an affirmative duty to report and return any payment which Defendants then knew or later realized was improperly provided or excessive for any reason, including, for example, because the patient was ineligible to receive the care or services at all or at the level at which they were provided, because the service was not authorized or approved in accordance with regulations, because the care or service or the level of the care or service was not reasonable and necessary, or because the Defendants had violated the Anti-Kickback statute. *See* 42 U.S.C. § 1320a-7k(d).

358.

At all times relevant to this Complaint, the United States provided funds to the States through the Medicaid program pursuant to Title XIX of the Social Security Act, 42 *US.C.* §§ 1396 *et seq.*

## COUNT I

### FALSE CLAIMS ACT VIOLATIONS:
### Continuous Care and Transitional Care

359.

The allegations set forth in the preceding paragraphs of this Complaint are realleged as if fully set forth below.

### 31 U.S.C. § 3729(a)(1)(A)

360.

As a result of the schemes, acts and failures described in this Complaint, Defendants knowingly — with actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information — presented or caused to be presented false or fraudulent claims for reimbursement for:

(a)    continuous care for persons who did not need that level of care;

(b)    continuous care for persons without knowing whether the persons needed that level of care;

(c)    continuous care when the care Defendants offered did not meet the requirements for continuous care;

(d)    continuous care without knowing whether the care Defendants offered met the requirements for continuous care;

(e)    transitional care for persons who did not need that level of care;

(f)    transitional care for persons without knowing whether the persons needed that level of care;

(g)    transitional care when the care Defendants offered did not meet the requirements for transitional care or when Defendants were ineligible to bill for transitional care;

(h)    transitional care when Defendants were ineligible to bill for such care because, for example, they were providing hospice care during the same period or because another entity was providing transitional care during that same period.

(i)    a more expensive service when a cheaper service would have sufficed;

(j)    a more expensive service without determining whether a cheaper service would have sufficed.

Defendants' conduct violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

361.

As a result of the schemes, acts and failures described in this Complaint, Defendants and/or their agents violated and may continue to violate, and caused others to violate and continue to violate, 31 U.S.C. § 3729(a)(1)(A), by knowingly, with reckless disregard, presenting, or causing to be presented, a false or fraudulent claim for payment or approval.

362.

In certifying performance, requesting payment, and retaining overpayments, Defendants and/or their agents violated, and may continue to violate, 31 U.S.C. § 3729(a)(1)(A), by knowingly, with reckless disregard, presenting, or causing to be presented, a false or fraudulent claim for payment or approval.

### 31 U.S.C. § 3729(a)(1)(B)

363.

As a result of the schemes, acts and failures described in this Complaint, Defendants knowingly — with actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information - made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim:

(a)    continuous care for persons who did not need that level of care;

(b)    continuous care for persons without knowing whether the persons needed that level of care;

(c)    continuous care when the care Defendants offered did not meet the requirements for continuous care;

(d)    continuous care without knowing whether the care Defendants offered met the requirements for continuous care;

(e)    transitional care for persons who did not need that level of care;

(f)    transitional care for persons without knowing whether the persons needed that level of care;

(g)    transitional care when the care Defendants offered did not meet the requirements for transitional care or when Defendants were ineligible to bill for transitional care;

(h)     transitional care when Defendants were ineligible to bill for such care because, for example, they were providing hospice care during the same period or because another entity was providing transitional care during that same period.

(i)     a more expensive service when a cheaper service would have sufficed;

(j)     a more expensive service without determining whether a cheaper service would have sufficed.

Defendants' conduct violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

364.

As a result of the schemes, acts and failures described in this Complaint, Defendants and/or their agents submitted claims for payment under government-funded healthcare programs, and in so doing, violated and may continue to violate, and caused others to violate and continue to violate, 31 U.S.C. § 3729(a)(1)(B), by knowingly, with reckless disregard, making, using or causing to be made or used, a false record or statement material to a false or fraudulent claim.

365.

As a result of the schemes, acts and failures described in this Complaint, when Defendants certified performance, requested payment, and retained overpayments, Defendants and/or their agents violated, and may continue to violate, 31 U.S.C. § 3729(a)(1)(B), by knowingly, with reckless disregard, making,

using or causing to be made or used, a false record or statement material to a false or fraudulent claim.

### § 3729(a)(1)(D)

#### 366.

As a result of the schemes, acts and failures described in this Complaint, Defendants had possession, custody or control of property or money in the form of overpayments and improper payments for hospice and healthcare services, that was used, or to be used by the Government and knowingly delivered, or caused to be delivered, less than all of that money or property.  Defendants' conduct violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(D).

#### 367.

Defendants knew or should have known that they had received millions of dollars in overpayments and improper payments as a result of the schemes, acts and failures described in this Complaint, yet Defendants took no action to satisfy their obligations to repay or refund those payments to the government-funded healthcare programs and instead retained the funds and continued to bill the programs.  Defendants' conduct violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(D).

### § 3729(a)(1)(G)

368.

As a result of the schemes, acts and failures described in this Complaint, Defendants knowingly — with actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information - made, used or caused to be made or used, false records or statements purporting to support Defendants' claims for and Defendants' eligibility to keep payment for:

(a)    continuous care for persons who did not need that level of care;

(b)    continuous care for persons without knowing whether the persons needed that level of care;

(c)    continuous care when the care Defendants offered did not meet the requirements for continuous care;

(d)    continuous care without knowing whether the care Defendants offered met the requirements for continuous care;

(e)    transitional care for persons who did not need that level of care;

(f)    transitional care for persons without knowing whether the persons needed that level of care;

(g)    transitional care when the care Defendants offered did not meet the requirements for transitional care or when Defendants were ineligible to bill for transitional care;

(h)    transitional care when Defendants were ineligible to bill for such care because, for example, they were providing hospice care during the same period or because another entity was providing transitional care during that same period.

(i)    a more expensive service when a cheaper service would have sufficed;

(j)    a more expensive service without determining whether a cheaper service would have sufficed.

These false records and statements were material to Defendants' obligation to pay or transmit money or property to the Government.  Defendants' conduct violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

369.

As a result of the schemes, acts and failures described in this Complaint, Defendants knowingly — with actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information - concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government that had been overpaid to Defendants for:

(a)    continuous care for persons who did not need that level of care;

(b)    continuous care for persons without knowing whether the persons needed that level of care;

(c)    continuous care when the care Defendants offered did not meet the requirements for continuous care;

(d)     continuous care without knowing whether the care Defendants offered met the requirements for continuous care;

(e)     transitional care for persons who did not need that level of care;

(f)     transitional care for persons without knowing whether the persons needed that level of care;

(g)     transitional care when the care Defendants offered did not meet the requirements for transitional care or when Defendants were ineligible to bill for transitional care;

(h)     transitional care when Defendants were ineligible to bill for such care because, for example, they were providing hospice care during the same period or because another entity was providing transitional care during that same period.

(i)     a more expensive service when a cheaper service would have sufficed;

(j)     a more expensive service without determining whether a cheaper service would have sufficed.

Defendants' conduct violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

370.

As a result of the schemes, acts and failures described in this Complaint, the Government overpaid Defendants, and Defendants knowingly, with reckless disregard, made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government

as reimbursement for the windfall of improper payments that Defendants had received, in violation of 31 U.S.C. § 3729(a)(1)(G).

371.

As a result of the schemes, acts and failures described in this Complaint, the Government overpaid Defendants, and Defendants knowingly, with reckless disregard, concealed or knowingly and improperly, with reckless disregard, avoided or decreased their obligation to pay or transmit money or property to the Government as reimbursement for the windfall of improper payments that Defendants had received, in violation of 31 U.S.C. § 3729(a)(1)(G).

372.

Defendants knew or should have known that they had received millions of dollars in overpayments and improper payments as a result of the schemes, acts and failures described in this Complaint, yet Defendants took no action to satisfy their obligations to the Government to repay or refund those payments and instead retained the funds and continued to bill the government-funded healthcare programs.  Defendants' conduct violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

### 31 U.S.C. § 3729(a)(1)(C)

373.

As a result of the schemes, acts and failures described in this Complaint, Defendants and/or their agents violated, and may continue to violate, 31 U.S.C. § 3729(a)(1)(C), by conspiring to commit a violation of subparagraphs (A), (B), (D), or (G).

374.

The Government was damaged because, unaware that Defendants' claims were false and fraudulent, and relying on their accuracy, it paid those claims or failed to receive reimbursements that were due.  Had the Government known about the schemes, acts and failures described in this Complaint, it would not have paid those claims or would have received reimbursements that were due.

375.

As a condition of payment, the Government required the Defendants to comply with the relevant regulations and laws as well as the Anti-Kickback Statute, and to eschew the sort of schemes, acts and failures described in this Complaint. This compliance was material to the Government's decision to pay the Defendants and to not require reimbursement from the Defendants, and had a natural tendency to influence, or was capable of influencing, the payment or receipt of money or property.

376.

As a result of Defendants' false and fraudulent claims and actions, government-funded healthcare programs paid the Defendants millions of dollars that should not have been paid and the Defendants retained millions of dollars that the Defendants should have reimbursed to government-funded healthcare programs.

## COUNT II

**FALSE CLAIMS ACT VIOLATIONS:**
**Violations of the Anti-Kickback Statute**

377.

The allegations set forth in the preceding paragraphs of this Complaint are realleged as if fully set forth below.

378.

The Defendants knowingly and willfully offered or paid remuneration, directly as well as indirectly, and overtly as well as covertly, to persons in order to induce them to refer individuals to the Defendants for the furnishing of or arranging for the furnishing of items or services for which payment may be made in whole or part under a government-funded healthcare program, in violation of 42 U.S.C. § 1320a–7b(2)(A).

379.

The Defendants knowingly and willfully offered or paid remuneration, directly as well as indirectly, and overtly as well as covertly, to persons in order to induce them to purchase, order, or arrange for or recommend purchasing or ordering any good, facility, service or item for which payment may be made in whole or in part under a government-funded healthcare program, in violation of 42 U.S.C. § 1320a–7b(2)(B).

380.

As a result of the schemes, acts and failures described in this Complaint, Defendants submitted false and fraudulent statements and claims for payment for healthcare and healthcare services that were provided or procured in violation of the AKS and due to Defendants' illegal provisions of kickbacks.

381.

The Anti-Kickback statute is a critical provision and compliance with it is a condition of payment, and is material to the government's treatment of claims for reimbursement. Had the Government known that Defendants were engaging in fraudulent kickback practices, it would not have provided reimbursement for the claims submitted in violation thereof, but unaware that the claims were false and fraudulent, and relying on their accuracy, it paid those claims.

382.

As a result of Defendants' violations of the AKS, Defendants caused other providers of federally-funded healthcare services to submit false claims for care and services.

383.

As a result of Defendants' violations of the AKS, Defendants caused other providers of federally-funded healthcare services to submit false claims for care and services, when in fact the care and services were provided not by the other providers but by Defendants.

384.

The AKS has a very limited set of "safe harbors" for conduct that could possibly violate the statute, but has been deemed not to; no safe harbor protects the kind of fraudulent conduct Defendants have exhibited as set forth in this Complaint.

385.

The claims that Defendants submitted in violation of the Anti-Kickback statute constituted false or fraudulent claims for purposes of the False Claims Act. *See* 42 U.S.C. § 1320a-7b(g).

386.

In submitting false claims for payment for hospice and other government-funded healthcare services provided and procured in violation of the AKS, and causing others to do the same, Defendants knowingly, with reckless disregard, presented, or caused to be presented, a false or fraudulent claim for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

387.

In making and using false records and statements material to claims for payment and reimbursement for hospice and other healthcare services provided and procured in violation of the AKS, and causing others to do the same, Defendants knowingly, with reckless disregard, made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim, in violation of 31 U.S.C. § 3729(a)(1)(B).

388.

Despite their knowing and willful violations of the AKS, Defendants demanded and received millions of dollars in hospice payments from government-funded sources, yet took no action to satisfy their obligations to repay or refund those payments, and instead retained the funds and continued to bill the Government.

389.

As a result of their violations of the AKS, Defendants had possession, custody or control over property or money in the form of overpayments and improper payments, that was used, or to be used, by the Government and knowingly delivered, or caused to be delivered, less than all of that money or property, in violation of 31 U.S.C. § 3729(a)(1)(D).

390.

In making or using false records or statements material to claims for payment and reimbursement for hospice and other healthcare services provided and procured in violation of the AKS, and causing others to do the same, Defendants knowingly, with reckless disregard, made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, in violation of 31 U.S.C. § 3729(a)(1)(G).

391.

In concealing and knowingly and improperly avoiding or decreasing their obligation to repay government-funded healthcare plans for payments made for healthcare services provided and procured in violation of the AKS, and causing others to do the same, Defendants knowingly, with reckless disregard, concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, in violation of 31 U.S.C. § 3729(a)(1)(G).

392.

In violating the AKS, Defendants conspired to commit a violation of subparagraphs (A), (B), (D), and/or (G), in violation of 31 U.S.C. § 3729(a)(1)(C).

393.

Defendants' compliance or lack thereof with the Anti-Kickback statute, and their false claims and certifications about their compliance or lack thereof, were a condition of payment and were material to the Government's decision to pay the Defendants and other medical providers and to not require reimbursement of those payments, and had a natural tendency to influence, or were capable of influencing, the payment or receipt of money or property.

394.

As a result of Defendants' violations of the Anti-Kickback statute, government-funded healthcare programs paid the defendants and other healthcare providers millions of dollars that should not have been paid and the defendants retained millions of dollars that they should have reimbursed to government-funded healthcare programs.

## COUNT III

## FALSE CLAIMS ACT VIOLATIONS:
### Ineligible Patients

### 395.

The allegations set forth in the preceding paragraphs of this Complaint are realleged as if fully set forth below.

### 396.

Defendants, through their fraudulent business practices, regularly admit, retain and recertify individuals who are not eligible to receive government-funded hospice care and services.

### 397.

Defendants falsely certified, both expressly and by implication, on claim forms submitted to government-funded healthcare programs, and on admission and recertification documentation required to support those claims, that hospice care and services were medically indicated, reasonable and necessary for the patients receiving such care and services from the Defendants, and that continuing such care and services was medically indicated, reasonable and necessary.

### 398.

Defendants created and/or submitted documentation that falsely represented that certain recipients had a life expectancy of 6 months or less if the recipients'

illnesses ran their normal courses, when in fact those recipients had life

expectancies longer than 6 months.

399.

Defendants' compliance with regulations and documentation relating to their

patients' need for and eligibility for hospice care, and Defendants' certifications

about their patients' need for and eligibility for hospice care, were a condition of

payment, and were material to the Government's decision to pay the Defendants

and to not require reimbursement from the Defendants, and had a natural tendency

to influence, or were capable of influencing, the payment or receipt of money or

property.

400.

In submitting false and unsupported claims for payment for hospice care and

healthcare services for patients who were not eligible or became ineligible, or in

recklessly disregarding whether their patients were eligible or became ineligible,

Defendants knowingly, with reckless disregard, presented, or caused to be

presented, a false or fraudulent claim for payment or approval, in violation of 31

U.S.C. § 3729(a)(1)(A).

401.

In making or using false records and statements related to claims for

payment for hospice care and healthcare services for patients who were not eligible

or became ineligible, or in recklessly disregarding whether or not such records and statements were false, Defendants knowingly, with reckless disregard, made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim, in violation of 31 U.S.C. § 3729(a)(1)(B).

402.

Defendants knew or should have known that they had received millions of dollars in healthcare payments for patients who did not qualify for hospice care and services, or showed reckless disregard for whether they had received such payments, yet Defendants took no action to satisfy their obligations to the Government to repay or refund those payments and instead retained the funds and continued to bill the Government.

403.

Defendants had possession, custody, or control of property or money, in the form of payments for hospice care and services for patients who were not eligible or became ineligible, that was used, or to be used, by the Government, and knowingly delivered, or caused to be delivered, less than all of that money or property, in violation of 31 U.S.C. § 3729(a)(1)(D).

404.

In making or using false records or statements material to an obligation to repay federally-funded government programs for claims for payment for hospice

care and services for patients who were not eligible or became ineligible, and causing others to do the same, Defendants knowingly, with reckless disregard, made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, in violation of 31 U.S.C. § 3729(a)(1)(G).

405.

In concealing or knowingly and improperly avoiding or decreasing an obligation to repay government-funded healthcare programs for hospice care and healthcare services for patients who were not eligible or became ineligible, and in causing others to do the same, Defendants knowingly, with reckless disregard, concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, in violation of 31 U.S.C. § 3729(a)(1)(G).

406.

In submitting false and unsupported claims for payment for hospice care and healthcare services for patients who were not eligible or became ineligible, making or using false records or statements related to such claims, and failing to reimburse the Government for payments for hospice care and healthcare services for those patients, Defendants conspired to commit a violation of subparagraphs (A), (B), (D), and/or (G), in violation of 31 U.S.C. § 3729(a)(1)(C).

407.

As a result of Defendants' false and fraudulent claims, actions and omissions, government-funded healthcare programs paid the defendants millions of dollars for hospice care and services that the programs should not have paid, and the defendants retained millions of dollars that the defendants should have reimbursed to government-funded healthcare programs.

## COUNT IV

## VIOLATION OF THE GEORGIA FALSE CLAIMS ACT

408.

The allegations set forth in the preceding paragraphs of this Complaint are realleged as if fully set forth below.

409.

Relator states that upon information and belief, the course of conduct described in this Complaint takes place in Georgia as well as in the other states where Defendants conduct business.

410.

In relevant part, the Georgia Medicaid False Claims Act, O.C.G.A. § 49-4-168, et seq., provides liability for any person who:

(1)    Knowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;

(2)    Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

(3)    Conspires to commit a violation of paragraphs (1), (2), (4), (5), (6), or (7) of this subsection;

(4)    Has possession, custody, or control of property or money used or to be used by the Georgia Medicaid program and knowingly delivers, or causes to be delivered, less than all of such property or money;

\*    \*    \*

(7)    Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit property or money to the Georgia Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit property or money to the Georgia Medicaid program.

O.C.G.A. § 49-4-168.1(a).  Defendants violated the aforesaid provisions by engaging in the fraudulent and illegal practices described in this Complaint.

411.

As described in this Complaint and set forth in Counts I, II and III of this Complaint, Defendants knowingly presented or caused to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval, in violation of O.C.G.A. § 49-4-168.1(a)(1).

412.

As described in this Complaint and set forth in Counts I, II and III of this Complaint, Defendants knowingly made, used, or caused to be made or used a false record or statement material to a false or fraudulent claim, in violation of O.C.G.A. § 49-4-168.1(a)(2).

413.

As described in this Complaint and set forth in Counts I, II and III of this Complaint, Defendants had possession, custody, or control of property or money used or to be used by the Georgia Medicaid program and knowingly delivered, or caused to be delivered, less than all of such property or money, in violation of O.C.G.A. § 49-4-168.1(a)(4).

414.

As described in this Complaint and set forth in Counts I, II and III of this Complaint, Defendants knowingly made, used, or caused to be made or used a false record or statement material to an obligation to pay or transmit property or money to the Georgia Medicaid program, in violation of O.C.G.A. § 49-4-168.1(a)(7).

415.

As described in this Complaint and set forth in Counts I, II and III of this Complaint, Defendants knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit property or money to the Georgia Medicaid program, in violation of O.C.G.A. § 49-4-168.1(a)(7).

416.

As described in this Complaint and set forth in Counts I, II, and III of this Complaint, Defendants conspired to commit a violation of paragraphs (1), (2), (4)

and/or (7) of the Georgia Medicaid False Claims Act subsection described above, in violation of O.C.G.A. § 49-4-168.1(a)(3).

417.

The State of Georgia, by and through the State of Georgia Medicaid program and other healthcare programs, and unaware of Defendants' fraudulent and illegal practices, paid the false and fraudulent claims submitted by Defendants.

418.

Compliance with applicable regulations and state and federal laws, as set forth in this Complaint and Counts I, II and III, was a condition of payment of claims submitted to the State of Georgia in connection with Defendants' fraudulent and illegal practices.

419.

Had the State of Georgia known that Defendants were engaged in the schemes, acts and failures described in this Complaint, it would not have paid the claims submitted by Defendants in connection with Defendants' fraudulent and illegal practices.

420.

As a result of Defendants' violations of O.C.G.A. § 49-4-168, *et seq.,* the State of Georgia has been damaged in an amount to be proven at trial.

421.

The Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Georgia False Medicaid Claims Act, on behalf of himself and the State of Georgia.

422.

This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Georgia in the operation of its healthcare programs.

## **PRAYER**

WHEREFORE, Plaintiffs respectfully pray and demand the following:

(a)    That process issue and service be made upon Defendants to appear and answer this Complaint as provided by law;

(b)    That judgment be entered in favor of Plaintiffs and against Defendants on all Counts of the Complaint;

(c)    That Plaintiffs be awarded all damages flowing from Defendants' wrongful acts;

(d)    That Plaintiffs be awarded three (3) times the amount of damages sustained by the United States and the State of Georgia as a result of the

wrongful acts of the Defendants, pursuant to 31 U.S.C. § 3729, *et seq.*, and the Georgia Medicaid False Claims Act;

(e)    That Plaintiffs be awarded a civil penalty for each wrongful act by Defendants, 31 U.S.C. § 3729, *et seq.*, and the Georgia Medicaid False Claims Act;

(f)    That Plaintiff/Relator Mr. Cole be awarded a portion of all damages, pursuant to 31 U.S.C. § 3729, *et seq.*, and the Georgia Medicaid False Claims Act;

(g)    That Plaintiff/Relator Mr. Cole be awarded expenses, attorneys' fees and costs, pursuant to 31 U.S.C. § 3729, *et seq.*, and the Georgia Medicaid False Claims Act;

(h)    That Plaintiffs be awarded such other and further relief as is justified by the facts and law that this Court deems just and proper; and,

(i)    That Plaintiffs be granted a trial by jury.

Complaint

Submitted this 30th day of December, 2016.

*Counsel for Plaintiffs/Relator,*

**The Wallace Law Firm L.L.C.**


/s/ Lee Tarte Wallace
LEE TARTE WALLACE
Georgia Bar No.:  698320

2170 Defoor Hills Road
Atlanta, Georgia 30318
(404) 814-0465